Patricia **FULLER**, Plaintiff–Appellant,

v.

**CITY OF OAKLAND, CALIFORNIA; George Hart; Antonio Romero,** Defendants–Appellees.

Nos. 92–16081, 92–16402.

United States Court of Appeals, Ninth Circuit.

Argued and Submission Deferred May 13, 1994.

Submitted Feb. 7, 1995.

Decided Feb. 14, 1995.

As Amended April 24, 1995.

Sheila A. Reid, John Houston Scott, San Francisco, CA, for plaintiff-appellant.

Kathy Banke, Crosby, Heafey, Roach & May, Oakland, CA, Marilyn Kaplan, Deputy City Atty., Oakland, CA, for defendants-appellees.

Before: GOODWIN, POOLE and REINHARDT, Circuit Judges.

POOLE, Circuit Judge:

Patricia Fuller, a former Oakland police officer, appeals the district court's entry of judgment against her on her claims for sex discrimination and sexual harassment. Fuller sued the City of Oakland under Title VII and 42 U.S.C. § 1983 after it allegedly failed to properly investigate her complaints and take appropriate steps to end the harassment. After a bench trial, the district court found against Fuller on both claims, concluding that all harassment stopped as soon as the Police Department learned of the situation. The district court also ruled that even though the subsequent investigation was seriously flawed, § 1983 liability could not attach because no city policymaker ever decided to conduct the investigation in a discriminatory manner.

On appeal, Fuller argues that the district court erred because the harassment continued after the Department learned of it and the Department failed to take reasonable steps to end it. Fuller also alleges that she was deprived of her right to a jury trial on the § 1983 claim. We reverse the district court's judgment against Fuller on her Title VII claim and remand for a determination on the appropriate remedy. Moreover, we agree that a jury trial was never properly waived. Nor was any error in the denial of a jury trial harmless, because the record does not establish that the district court could have granted summary judgment *sua sponte*. Accordingly, we reverse and remand on the § 1983 claim as well.

I

Patricia Fuller served as a police officer for the City of Oakland from 1985 to 1989. Beginning in 1986, she had a romantic relationship with a fellow officer, Antonio Romero. By September 1986, Fuller no longer wished to continue the relationship. What followed is a disturbing tale.

During the summer of 1986, Fuller had received a series of hang-up calls at home. These stopped when she changed her number again. In September 1986, Fuller received up to 25 hang-up calls a day, only on her days off. The calls continued after she changed her number in October, and again after she moved and changed her number in December. Calls in January, received only on her nights off, continued only on her nights off even after her work schedule changed. Fuller's number was unlisted, but available to Oakland Police Department employees.

After September, Romero continued to call Fuller at home and at work, write her, and track her down on her beat. By March 1987, Romero had acknowledged that Fuller no longer wanted to see him. Shortly thereafter, he called her at work and threatened to kill himself. Fuller changed her home number. A few days later, as Fuller approached her car near the officers' parking lot, Romero confronted her about changing her number. He blocked her car from leaving, held open her car door, and extorted her new number by making it clear he would not let her leave until she gave it to him.

In April, Romero called Fuller to angrily question her about a new boyfriend, and Fuller changed her number again. Romero called her the next week, despite her request that he no longer call her, and claimed he had "inadvertently" come across her number in the personnel files.

In July 1987, Fuller was driving her boyfriend (another fellow officer) home during

the day. Romero came speeding at them in an unmarked police car, and Fuller was forced to swerve to avoid a head-on collision. She believed he was following her. Romero later lied both to her and to the IA investigator about where he had been headed.

In October, Romero was transferred into a position with supervisory authority over Fuller. At this time, other officers learned of Romero's prior conduct and, over Fuller's objections, the matter was brought to the attention of Police Chief George Hart. Fuller did not want an Internal Affairs ("IA") investigation because she feared for her safety given Romero's drinking and prior threat of suicide. Nevertheless, the Department began an IA investigation. In late October, Lieutenant Clyde Simms, the head of IA, met with Fuller and offered an immediate transfer; she refused.[1]

During the next two months, Romero conducted an investigation of the arrest rates of officers engaged in pro-active drug enforcement, which Fuller contends focused solely on herself and her allies in the department. Romero approved several work requests from Fuller, sometimes after some delay, and Fuller believes these requests were delayed in order to harass her. In December, Romero asked Fuller to speak up during a line-up and ordered her to report to her station in tones Fuller read as harassing. That same month, Fuller married her boyfriend and took pregnancy-induced light duty in what she considered an unfavorable assignment.

On December 28, the IA investigating officer, John Parker, recommended closing the investigation for lack of evidence. At the time, Parker had not even interviewed Romero or numerous other percipient witnesses, and none of the documents gathered to that point gave reason to believe Fuller had been untruthful. Parker's recommendation was in part based on the fact that a phone trap, initiated after Romero had learned of the investigation, showed no calls from Romero to Fuller. The investigation was not closed, but Officer Parker still delayed interviewing Romero until February 16, shortly after Fuller had filed an EEO

complaint and the EEOC had contacted the Department. After some further investigation, the final IA report recommended a finding of "Unfounded," meaning that evidence sufficiently proved the alleged incidents did not occur. Chief Hart approved this report.

Fuller remained on light duty or on pregnancy leave for the remainder of 1988. In late 1988, based on a rumor that Romero would be transferred, she selected her old shift for the following year. Fuller soon learned Romero had not been transferred. She did not then formally request a transfer for herself. Instead, facing a statute of limitations problem, she filed suit and sent a letter concerning the situation to the city's Affirmative Action Counselor. In March 1989, Fuller returned to duty in a post subordinate to that of Romero.

Fuller identifies a handful of further incidents she considered harassing. Romero conducted a short investigation of Fuller's handling of a stabbing victim who died after she reached the scene. He also asked her for an alibi after his car was stolen. Fuller asserts additionally that Romero on one occasion unnecessarily called her to the podium during a lineup. Fuller reported feeling ostracized and afraid for her safety, because visible isolation on the beat endangers an officer's safety. Fuller developed a severe stress disorder and went on disability leave.

One of Fuller's examining psychiatrists wrote a letter concluding that Fuller should not be returned to duty under Romero. However, Fuller was cleared for return to duty and told she would be assigned to a post subordinate to that of Romero. Rather than face this prospect, she resigned.

Fuller initially filed suit against the City of Oakland, Romero, and Chief Hart. Romero and Hart have been dismissed as defendants, and the City is the only defendant remaining. The only claims remaining are under Title VII, for sexual harassment, and under 42 U.S.C. § 1983, for sex discrimination in the conduct of the IA investigation.

On January 11, 1991, Fuller's attorney filed a letter with the district court waiving a jury trial. Later in the same month, the

---

1. Fuller disputes the district court's finding that this meeting and offer ever occurred. For purposes of this appeal, we assume that the district court's finding to the contrary was correct.

defendants refused to waive their right to a jury, thereby requesting one. A bench trial was conducted in September, and Fuller understood the Title VII claim to be the only one at issue. However, the district court issued a judgment finding against Fuller on both remaining claims. The City of Oakland assented to the judgment, and the district court deemed its request for a jury waived. When Fuller objected, the district court allowed her to submit an offer of proof as to what a second trial would show with regard to her § 1983 claim. After considering the proffer, the district court reentered judgment on the § 1983 claim. Fuller has timely appealed.

We must decide whether the City of Oakland violated Title VII, and whether Fuller was deprived of her Seventh Amendment right to a jury trial.

## II

### A

■ Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.,* expressly prohibits sex discrimination in employment. 42 U.S.C. § 2000e–2(a)(1). This general prohibition extends to sexual harassment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). On appeal, Fuller attempts to prove sexual harassment only under a "hostile work environment" theory, one of two available to her.[2] To prove that such an environment existed, she must show that: 1) she was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) the conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ellison v. Brady,* 924 F.2d 872, 875–76 (9th Cir.1991); *accord EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1514–15 (9th Cir.1989). The working environment must both subjectively and objectively be perceived as abusive. *Harris v. Forklift Sys., Inc.,* — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d

295 (1993). Whether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics. *Cf. Ellison,* 924 F.2d at 879. Hostility must be measured based on the totality of the circumstances. *Harris,* — U.S. at —, 114 S.Ct. at 371. However, even if a hostile working environment exists, an employer is only liable for failing to remedy harassment of which it knows or should know. *Ellison,* 924 F.2d at 881.

### B

■ On appeal, Fuller objects to the district court's finding that Romero's conduct was not sufficiently severe and pervasive to constitute a hostile working environment. We agree in part.

■ The district court's underlying factual findings regarding the sexual harassment claim are reviewed only for clear error. *Hacienda Hotel,* 881 F.2d at 1514. However, whether the conduct found was sufficiently severe and pervasive to constitute sexual harassment is a question of law reviewed de novo. *Id.*

In its findings of fact, the district court concluded that most of Fuller's factual allegations were true. Nevertheless, despite the presence of what it termed "sex-based harassment," it found that the conduct alleged was insufficiently severe and pervasive to constitute sexual harassment. We conclude that the district court erred with respect to the period from March–October 1987, but not with respect to the period thereafter.

The district court concluded that as of March, Romero was aware Fuller no longer wished to see him. Between March and October, Romero 1) called Fuller and threatened to kill himself, 2) ran her and her new boyfriend off the road, 3) forcibly extracted her new unlisted phone number from her, 4) obtained yet another new unlisted number from police files, and 5) called her or left

---

**2.** Before the district court, Fuller contended that she was subjected to "quid pro quo" sexual harassment as well. She has not appealed the

portion of the district court's judgment denying this claim.

unsolicited messages for her on numerous occasions, including one call in which he angrily questioned her about her new boyfriend.

The first two of these incidents, while only single incidents, are sufficiently extreme such that Fuller would no longer know what to expect next from Romero, and reasonably be concerned that he might do anything at any time. The latter three items would reasonably lead Fuller to believe that, no matter how much she tried, she couldn't escape Romero. Taken together, the fear that Romero might do anything and the fact she couldn't escape would lead a reasonable woman to feel her working environment had been altered. Fuller apparently felt so subjectively as well, for she resisted an IA investigation in October out of fear over how Romero might respond.

█ The same cannot be said for the period after October 1987. At no time did Fuller and Romero come in frequent contact; indeed, for a fifteen month period they had virtually no contact. None of the incidents of contact appear to have been more than routine. Fuller does not allege that the unwanted calls continued. Romero does not appear to have used his supervisory position to come down on Fuller more than other officers: he approved her work requests, investigated her handling of one or two matters, and on one occasion was suspicious of her when his car was stolen. Even in light of what went before, a reasonable woman would not find the incidents Fuller details sufficiently severe and pervasive to alter her working environment.

### C

█ In light of our conclusion that Fuller was subjected to a hostile working environment, we must further consider whether the city's response was sufficient to absolve it from liability.

As previously noted, an employer can only be liable for harassment of which it knows or should know. *Ellison*, 924 F.2d at 881. The parties agree that for Title VII purposes, the City did not know, and had no reason to know, of Romero's conduct toward Fuller until October 1987. Oakland contends that because Fuller was not subject to a hostile

work environment after October 1987, it cannot be held liable. It asserts that whether an employer has met its duty is measured solely by results: did the harassment stop? The district court agreed, concluding that even if Fuller had proven sexual harassment, she would have had to show that the City's actions allowed the harassment to continue.

In this circuit, an employer's remedial obligations are defined by *Ellison v. Brady*. Here, as in other circuits, "remedies should be 'reasonably calculated to end the harassment.'" *Id.* at 882 (quoting *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir.1983)). *Ellison* lays out a two-part test that goes beyond short-term results:

> In essence, then, we think that the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment. In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers from unlawful conduct.

*Id.* (footnote omitted). As the City sees it, because the harassment stopped, its response was *ipso facto* reasonable.

█ However, this analysis omits a critical step. The fact that harassment stops is only a test for measuring the *efficacy* of a remedy, not a way of excusing the *obligation* to remedy. Once an employer knows or should know of harassment, a remedial obligation kicks in. *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994) (when employee is sexually harassed, the "only question is whether [the employer] is relieved of liability for [the harasser's] actions because it took sufficient disciplinary and remedial action in response to [the employee's] complaints."), *cert. denied,* —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); *Hacienda Hotel,* 881 F.2d at 1516 (holding employer liable for failure to take "prompt remedial action" once it knew of allegations). That obligation will not be discharged until action—prompt, effective action—has been taken. Effectiveness will be measured by the twin purposes of ending the current harassment and deterring future harassment—by the same offender or others. *Ellison,* 924 F.2d at 882. If 1) no remedy is

undertaken, or 2) the remedy attempted is ineffectual, liability will attach. Our prior cases stand for the proposition that an employer's actions will not necessarily shield it from liability if harassment continues. *E.g., Intlekofer v. Turnage,* 973 F.2d 773, 780–81 (9th Cir.1992). It does not follow that the employer's failure to act will be acceptable if harassment stops.

Putting it another way, even if inaction through some Orwellian twist is described as a "remedy," it will fail the deterrence prong of the *Ellison* test whether or not the individual harasser has voluntarily ceased harassment. Nor can inaction fairly be said to qualify as a remedy "reasonably calculated to end the harassment." Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred. To do so amounts to a ratification of the prior harassment. We refuse to make liability for ratification of past harassment turn on the fortuity of whether the harasser, as he did here, voluntarily elects to cease his activities, for the damage done by the employer's ratification will be the same regardless.

The City's argument reflects a fundamental misunderstanding about Title VII. It is the existence of past harassment, every bit as much as the risk of future harassment, that the statute condemns. "Employers have a duty to 'express[ ] strong disapproval' of sexual harassment, and to 'develop[ ] appropriate sanctions.'" *Ellison,* 924 F.2d at 881 (quoting 29 C.F.R. § 1604.11(f)).

Here, the City of Oakland had an obligation to remedy Romero's harassment once it learned of it in October 1987. Nothing the City did relieved it of that obligation. The district court was understandably critical of the City's response:

... the court is troubled by serious deficiencies in the IA investigation which give the appearance of bias against the plaintiff. IA failed to interview Romero promptly before he learned of the investigation. Contrary to the representations to plaintiff, Romero apparently was warned of the claims against him so that he could prepare extensive documentation in his defense.

When Romero's version of events differed from plaintiff's, IA often accepted Romero's version without taking reasonable and easy steps to corroborate that version. For example, with respect to Romero's assertion that he was not responsible for the hang-up calls plaintiff had received, IA accepted his assertion without checking his phone records for most of the months plaintiff had received the calls. Even when Romero admitted that he lied to the IA, IA failed to corroborate Romero's second explanation for driving near [Fuller's boyfriend's] home the night of the near collision.

In addition, IA failed to interview Sgt. Bingham, a percipient witness favorable to plaintiff. When IA found evidence which contradicted Romero's version of events ... such evidence was not given sufficient weight. Further, IA's failure to reprimand or discipline Romero for the pre-October harassment is also inexplicable.

District Court Findings of Fact at 30–31. The district court further recognized that "the IA investigation was inadequate and does not constitute adequate remedial action." *Id.* at 31. We agree.

An employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have "remedied" what happened. Denial does not constitute a remedy. Nor does the fact of investigation alone suffice; an investigation is principally a way to determine whether any remedy is needed and cannot substitute for the remedy itself. Nor, even if the district court correctly held that the disputed October 29 meeting occurred, can the purported offer of transfer be counted as sufficient: "[H]arassment is to be remedied through actions targeted at the *harasser,* not the victim." *Intlekofer,* 973 F.2d at 780 n. 9.

We conclude that the district court erred in finding Fuller had not been subjected to a hostile workplace environment prior to October 1987. Because Oakland failed to take *any* appropriate remedial steps once it learned of the harassment, it cannot be shielded from liability. Therefore, the district court should have entered judgment in favor of Fuller on her Title VII claim.

## III

■ Fuller's other main contention is that the district court's determination of her § 1983 claim violated her Seventh Amendment right to a jury trial. We find no constitutional deprivation, but conclude that the district court's conversion of the claim to a non-jury matter violated the Federal Rules of Civil Procedure.

The precise chronology is critical here. On January 11, 1991, Fuller's attorney wrote a letter to the district court, informing her that "Plaintiff Patricia Fuller waives a jury trial as to her Section 1983 claims." Eleven days later, however, the defendants indicated by letter that "they *will not* waive their right to a jury." The case proceeded to a bench trial on the Title VII claim in the fall of 1991.

On February 10, 1992, the district court issued a decision deciding both the Title VII and § 1983 claims in favor of the City of Oakland. Fuller objected and withdrew her "offer" to waive a jury. At a March 27 hearing on Fuller's objections, the City of Oakland for the first time waived its right to a jury. In response to an argument by Fuller that no jury had ever been waived on the § 1983 claim, the district court replied:

> THE COURT: In this case there was an explicit written waiver by plaintiff and the defendants have acceded thereto.
>
> MR. SCOTT: No, they didn't. They said they wouldn't waive a jury and that's why the case was bifurcated. This trial was bifurcated.
>
> THE COURT: And now they have acceded to it.
>
> MR. SCOTT: No, we haven't.

> MR. CHINCHILLA: Yes, we have. We raised no objection. We raised no objections, your honor.
>
> MR. SCOTT: You never accepted and offered to stipulate to waive the jury.
>
> MR. CHINCHILLA: We—it is our position, your honor, the only people that have a right to complain are those that have reserved the right to a jury trial.

Reporter's Transcript 3/27/92 at 9–10. We must unpeel the procedural layers this situation presents.

■ There is no dispute that the Seventh Amendment right to a jury trial, like other constitutional rights, can be waived. *United States v. Moore,* 340 U.S. 616, 621, 71 S.Ct. 524, 526, 95 L.Ed. 582 (1951); *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 673 (9th Cir.1975). Fuller's statement through her attorney is clear and unmistakable. The January 11 letter constituted a waiver of her Seventh Amendment rights.

■ This is not the end of matters, however, because the Federal Rules of Civil Procedure also come in to play. Shortly after Fuller's purported waiver, the City of Oakland unmistakably demanded a jury. Fuller proposes that we view the two sides' exchange in contract terms: Fuller "offered to stipulate" to a trial without a jury, the City never "accepted" before the offer was withdrawn, and thus no waiver was ever effectuated under Rules 38(d) and 39(a).

■ This argument is based on a misreading of the rules. Rules 38 and 39 outline procedures for the preservation of the right to a jury.[3] Rule 38(b) establishes an affirmative duty for a party to file a jury demand; the failure to file a demand constitutes a

---

3. Rules 38 and 39 read in relevant part as follows:

> (b) **Demand.** Any party may demand a trial by jury of any issue triable of right by jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue, and (2) filing the demand as required by Rule 5(d) ...
>
> .　　.　　.　　.　　.
>
> (d) **Waiver.** The failure of a party to serve and file a demand as required by this rule constitutes a waiver by the party of trial by

> jury. A demand for trial by jury may not be withdrawn without the consent of the parties. Fed.R.Civ.P. 38.
>
> (a) **By Jury.** When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury.... Fed.R.Civ.P. 39.

waiver of the right. Fed.R.Civ.P. 38(d). However, once one party files such a demand other parties are entitled to rely on that demand for the issues it covers, and need not file their own demands. *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 690 (9th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). Once a demand has been made, it may only be withdrawn through an oral or written stipulation by all parties. Fed.R.Civ.P. 39(a). Fuller's letter was not an "offer to stipulate" under Rule 39(a) because a stipulation only becomes required once at least one party has demanded a jury. As of January 11, no party had. Consequently, even if we were to interpret Rule 39(a) using contract principles, the Rule would still have no bearing on Fuller's pre-demand waiver.

Although the Federal Rules do not void Fuller's waiver, they are not without comfort for her position. On its face, Rule 39(a) makes no distinction between parties who have offered express waivers and those who have stood silent. Under a strict application of the rules, the City demanded a jury, and Fuller never agreed to a withdrawal of that demand under either of the methods provided for by Rule 39(a). Fuller was therefore as entitled as any party to rely on the City's jury demand. Under a literal reading, a jury trial should still have been required.

Whatever the intuitive appeal of such a straightforward approach, we cannot stop with the language of the Rules. This Circuit declines to apply a strict approach to Rules 38 and 39. *See White v. McGinnis*, 903 F.2d 699, 701–03 (9th Cir.) (en banc) (rejecting literal approach in favor of equitable considerations), *cert. denied*, 498 U.S. 903, 111 S.Ct. 266, 112 L.Ed.2d 223 (1990); *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1305 (9th Cir.) (rejecting formalistic reading and "look[ing] beyond the facial language and appl[ying] the Rules in a manner consistent with their purpose."), *cert. denied*, 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 259 (1983).

In particular, *Reid Brothers* limits the application of the Rule 39(a) requirements to those parties who can be said to have relied on the jury request a party is seeking to withdraw. *Id.* at 1304. In that case, a defendant had strenuously opposed plaintiffs' demand for a jury, but when the plaintiffs attempted to waive their demand to secure an earlier trial date, refused to consent to the waiver. The court concluded that by virtue of its earlier opposition, the defendant not only waived its right to a jury, but also "its right to rely on the protections of Rules 38(d) and 39(a)." *Id.* The court reasoned that the rules were designed to protect parties who relied on others' jury demands by not filing their own; by its express opposition, the defendant had made it clear that it was not relying, and therefore the plaintiffs could unilaterally relinquish their demand, the language of the Rules notwithstanding. The court distinguished this situation from cases in which a defendant had remained merely silent. *Id.* at 1304–05.

The City urges us to apply *Reid Brothers* to bar Fuller from objecting to the City's withdrawal of its jury demand. We decline to do so, however, and instead conclude that the *Reid Brothers* exception to the language of Rule 38(d) and 39(a) ceases to apply once trial has begun. Our decision is compelled by the language of the Federal Rules, the policies behind our prior decisions, and constitutional considerations.

Of relevance is one of the primary rationales behind *White v. McGinnis*, the leading jury waiver case in the circuit. *White* reaffirms a simple principle: a party ought not to have two bites at the procedural apple. In *White*, the plaintiff demanded a jury, then stood silently by as the court proceeded to try his claim from the bench. Only after the court had ruled against him did he object. *White*, 903 F.2d at 700. We concluded that that was too late, for "[t]he appellant chose to argue his case fully before the district judge; it is not unjust to hold him to that commitment." *Id.* at 703; *accord Lovelace v. Dall*, 820 F.2d 223, 228 (7th Cir.1987) ("Another policy justifying the jury demand waiver rule is the view that it is unfair to permit a party to have a trial, discover that it has lost, and then raise the jury issue because it is unsatisfied with the result at trial.")

This case presents a *White v. McGinnis* situation, but with a twist. Here, the City of

Oakland stood silently by as the district court issued a ruling *in their favor*, then, understandably, "acceded" to the judgment. Had the district court found against the City, it just as surely would have objected, and rightly so, for prior to the court's February 10 ruling it had never waived its demand for a jury. Nor would *White* have prevented its objection. This was a two-claim case, not a one-claim case, containing both bench trial and jury trial components. Therefore, nothing in the fact that a bench trial was ongoing would have alerted the City to the fact that the district court had, *sub silentio,* decided to try the § 1983 claim as well. Nor was it clear from the pretrial conference that both issues would be tried. Because the City had not knowingly sat on its rights, it would still have been entitled to object.

Under the City's theory, and the approach adopted by the district court, the City would be permitted two bites at the apple. If the district court ruled for it, the City could accede to the judgment. If not, it could object on the ground that it had never waived its Seventh Amendment rights. To extend the rule of *Reid Brothers* here and bar any objection by Fuller to this thirteenth-hour waiver would achieve the very result that the rule of *White v. McGinnis* was designed to prevent. This we decline to do. A party cannot fairly be permitted to gain two chances at victory by waiting until after it is advised of the judge's decision to decide whether to waive its right to a jury.

This policy extends to a period before the judge has indicated a proposed decision as well. As previously noted, the rationale behind *Reid Brothers* was a recognition that Rule 38(d) was designed to allow other parties, once one party had filed a jury demand, to rely on that demand without having to file their own. *Reid Bros.,* 699 F.2d at 1304; *see also DePinto v. Provident Sec. Life Ins. Co.,* 323 F.2d 826, 832 (9th Cir.1963), *cert. denied,* 376 U.S. 950, 84 S.Ct. 965, 968, 969, 11 L.Ed.2d 969, 970 (1964). Once a party demonstrates through its actions that it has not relied on another's jury demand in failing to file its own, the reason for allowing it to object when another side unilaterally seeks

to withdraw its demand dissolves. *Reid Bros.,* 699 F.2d at 1304. However, once trial begins, other reliance interests come into play, affecting how each side elects to present its case. In a case like this one, different issues will be at stake in presenting a § 1983 case than in presenting a Title VII case. Moreover, the same "two bites" problem is present. If a jury demand can be unilaterally withdrawn after trial begins, a party like the City of Oakland would have the chance to see how its case goes and what the demeanor of the trial judge is and, if favorable, to then unilaterally waive its demand in light of the improved odds. This unsupportable result is akin to allowing a gambler to switch his bet as the horses reach the home stretch.

 Accordingly, we conclude that whatever right a party may have to withdraw a jury demand unilaterally under *Reid Brothers,* that right is extinguished at the onset of trial. Once trial begins, a party may no longer unilaterally withdraw its jury demand; other parties are entitled to rely whether they have waived their rights or not, and withdrawal may occur only in compliance with the language of Rule 39(a).

Our conclusion that *Reid Brothers* does not extend indefinitely is bolstered as well by the looming specter of constitutional considerations. To allow the district court to rule on Fuller's § 1983 claims would be to countenance what in all probability amounted to an advisory opinion. If the City of Oakland liked the ruling, it could let it stand, waiving its rights, while if it disliked it, it could assert them and render the decision a nullity. As *White* recognized, " 'court judgments should have meaning and effect instead of being a futile exercise that one of the parties will be able to overturn no matter what the result.' " *White,* 903 F.2d at 703 (quoting *Lovelace,* 820 F.2d at 228). But we need not explore such Article III quandaries if we limit the exception created by *Reid Brothers* to pretrial unilateral waivers. After that, the express language of Rules 38 and 39 governing withdrawal of jury demands applies with full force.[4]

4. We draw this line only for cases like the one

before us where the fact of a bench trial gives no

Accordingly, because the City of Oakland did not withdraw its jury demand prior to the start of trial, and because Patricia Fuller did not thereafter agree to the City of Oakland's attempted waiver in any of the ways provided for by Rule 39(a), that demand was never properly waived. The district court was therefore not permitted to *sua sponte* convert resolution of Fuller's § 1983 claims to a bench matter.

## IV

 Our conclusion that the district court could not convert its Title VII bench trial to a bench trial on both Fuller's claims does not end matters. The erroneous denial of a jury trial in a civil case is subject to harmless error analysis. *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985). The denial will be harmless only if "no reasonable jury could have found for the losing party, and the trial court could have granted a directed verdict for the prevailing party." *Id.* With the amendment of Federal Rule of Civil Procedure 50, the analysis now involves the essentially identical one of whether the district court could have granted a judgment as a matter of law. *See Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 827 (4th Cir.1994); Fed.R.Civ.P. 50(a).

In the peculiar procedural posture of this case, however, we conclude that this harmless error test cannot apply. Ordinarily, review of an erroneous denial of a jury demand arises following a bench trial on the issues covered by the jury demand. *E.g., id.; Sheet Metal Workers Local 19 v. Keystone Heating & Air Conditioning*, 934 F.2d 35 (3d Cir. 1991); *Davis & Cox*, 751 F.2d at 1514–17; *Roscello v. Southwest Airlines Co.*, 726 F.2d 217 (5th Cir.1984). That is not our case. Here, the district court conducted a bench trial on Fuller's Title VII claims. Despite the court's later attempt to dismiss the § 1983 claim, the trial transcript makes clear that it was the Title VII issues which were to be explored. When Fuller's counsel attempt-

ed to explore certain aspects of the IA investigation with Chief Hart, the district court cut him off, explaining that "We are not having a review here of the internal affairs investigation and determination. The question is really whether or not there was any sexual harassment." Reporter's Transcript 9/17/91 at 146.

The district court was of course quite right; the existence of sexual harassment was the central issue for Fuller's Title VII claims. But the conduct of the investigation, and the role of Chief Hart, was equally central to Fuller's § 1983 claims. The district court's assurance that these were not at issue makes clear that the September trial was only a Title VII trial. Given this, to ask whether a reasonable jury sitting at that trial could have found for Fuller on her § 1983 claim, or whether the district court could have entered a judgment as a matter of law on the claim, would be nonsensical.

 Instead, because judgment was entered against Fuller on the § 1983 claims prior to trial, the appropriate question is whether or not the district court could have granted summary judgment *sua sponte*. District courts unquestionably have the power to do so. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir.1982). *Sua sponte* summary judgment will be proper only when 1) no material dispute of fact exists, and 2) the losing party has had an adequate opportunity to address the issues involved, including adequate time to develop any facts necessary to oppose summary judgment. *Id.* at 311–12; *Buckingham v. United States*, 998 F.2d 735, 742 (9th Cir.1993). If the district court could have granted summary judgment *sua sponte*, any error in converting the § 1983 claim to a non-jury claim would have been harmless. The record does not establish that it could have done so.

notice that a jury issue may be being tried as well. Obviously, different considerations apply where an ongoing bench trial gives notice that a jury trial will not be held. *See White v. McGinnis*, 903 F.2d 699 (9th Cir.1990) (holding that silence in such circumstances may mandate find-

ing of waiver of jury demand). We determine only under what circumstances a party may voluntarily withdraw its jury demand, not the circumstances under which a party's demand may be deemed to have been involuntarily waived.

■ As is well-established, we must determine, viewing the facts in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Botefur v. City of Eagle Point,* 7 F.3d 152, 154 (9th Cir.1993). We must not weigh the evidence or determine the truth of the matter; the only question is whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ Only the City of Oakland remains as a defendant. The circumstances in which a municipality may be sued for constitutional violations under § 1983 are carefully circumscribed. A plaintiff may demonstrate liability by proving that a city employee committed the alleged violations pursuant to the city's official policy or custom. *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Gillette v. Delmore,* 979 F.2d 1342, 1346 (9th Cir.1992), *cert. denied,* — U.S. —, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993). Alternatively, a plaintiff may show that, rather than being the product of general official policy, on a given occasion the conduct was the result of "a deliberate choice . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1299–1301, 89 L.Ed.2d 452 (1986); *Gillette,* 979 F.2d at 1346. Finally, a plaintiff may show that an official policymaker either delegated policymaking authority to a subordinate or ratified a subordinate's decision, approving the "decision and the basis for it." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126–27, 108 S.Ct. 915, 925–26, 99 L.Ed.2d 107 (1988); *Hammond v. County of Madera,* 859 F.2d 797, 802 (9th Cir.1988).

These theories of liability exclude, inter alia, any liability based on respondeat superior. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. In contrast, however, we have held "conduct demonstrating gross negligence or reckless disregard for plaintiffs' civil rights . . . to be actionable under § 1983." *Hammond,* 859 F.2d at 803.

Fuller bases her § 1983 action on an alleged deprivation of equal protection in the conduct of the Internal Affairs investigation of her sexual harassment charge. She concedes that any sex discrimination was not the result of official policy or custom. This leaves as possible theories either *Pembaur* "single decision" liability or delegation/ratification under *Praprotnik.* The City of Oakland does not contest that for *Pembaur/Praprotnik* purposes, Police Chief Hart is an official policymaker.

Chief Hart's testimony established that upon receiving the complaint, he ordered an IA investigation. Subsequently, he was kept up-to-date "in the general sense of where we were with the case." Reporter's Transcript 9/16/91 at 131. At the close of the investigation, Chief Hart approved both the propriety of the investigation and the report's conclusion:

Q: Now, Lieutenant Sims who was actually involved in this, Chief when you were reviewing the conclusion of the internal affairs investigation and the recommendation that the allegations were unfounded, that the allegation of sexual harassment was unfounded, were you satisfied that the proper investigatory procedures were used in this case?

A: Yes, I was.

Q: And you were satisfied that you [sic] expectations of internal affairs were met?

A: Yes.

Q: Was there anything that you felt was improper or ineffective in the investigation?

A: No.

Q: When you approved, and you did approve the internal affairs investigative report?

A: I did.

Q: When you approved that report, what was the basis of that approval?

A: It was on the basis of my concurrence of the recommendations set forth by Lieutenant Sims. I concurred with his recommendations that the allegations were unfounded as to sexual harassment.

Q: What steps did you take to assure yourself that—that you were satisfied with the investigation?

A: I reviewed the summary if not in fact the entire case file. I satisfied myself that it had been thorough. I had no reason to disagree with his conclusion.

Reporter's Transcript 9/17/91 at 235–36.

We have thoroughly reviewed the case file in question. Viewing the evidence in the light most favorable to Fuller, as we must, the file reveals the glaring deficiencies that the district court noted in its findings of fact—delays in investigation, a failure to meet with or credit the testimony of witnesses supporting Fuller, an attempt to close the investigation without even speaking with Romero, and a one-sided resolution of disputes of fact. *See supra* at 1529. It is therefore conceivable that a jury could reasonably infer that the underlying investigation was performed in a sexually-biased fashion. Moreover, if Chief Hart's ambiguous testimony is interpreted to mean that he did review the case file—a case file arguably revealing a grossly inadequate investigation—and nevertheless approved the thoroughness of the investigation, then a jury could find that Hart acted with reckless disregard of Fuller's constitutional right not to have her investigation handled in a sexually-biased fashion.

When viewed in the light most favorable to Fuller, this case is in many ways similar to *Hammond v. County of Madera,* 859 F.2d 797 (9th Cir.1988). There, a county board was responsible for handling right-of-way and road acquisition for the county. The board delegated right-of-way acquisition to an agent who violated proper procedures in obtaining several deeds. Without investigating the propriety of the deeds, the board approved and recorded them. *Id.* at 802–03. We held that in light of the board's constructive knowledge of the proper procedures for right-of-way acquisition, its approval of the deeds and subsequent incorporation of roads based on them constituted reckless disregard for the rights of the affected property owners. *Id.* at 803. Chief Hart's ratification of the IA decision and the investigation that formed its basis, in light of his knowledge of proper IA procedure and his alleged perusal of the case file, would reflect a similar reckless disregard.

Our conclusion that the record does not foreclose Fuller's claim is bolstered as well by the effect that the procedural irregularities in this case had on the development of the record. As noted above, the district court made clear that it was sexual harassment, not the IA investigation, that was at issue in the trial. Consequently, although Chief Hart was on the stand for one and one-half days, the focus of Fuller's questioning was on issues unrelated to the § 1983 claim. Additionally, Fuller was not served with a proper Rule 56 motion specifically noting defects against which she could martial her evidence; she was instead directed by a district court which had already ruled against her to prepare an offer of proof justifying why a second bench trial before the same judge should be held. In an ordinary summary judgment case, Fuller would have had the opportunity to make a Rule 56(f) motion; here, she had none.

We need not pass on whether Fuller in fact had an adequate opportunity to respond prior to the district court's final judgment. We note only that because the district court's procedural error may have limited Fuller's opportunity to develop the record further, we are even more hesitant to rule that error harmless based on the selfsame record. Because the record does not establish that summary judgment could have been granted, we cannot hold the denial of a jury trial harmless.

### V

We hold that the district court incorrectly resolved the merits of Fuller's Title VII claim. It also erred by *sua sponte* electing to rule on Fuller's § 1983 claim at the completion of the Title VII bench trial. Nor can we conclude from the record before us that the error was harmless. The judgment of the district court is therefore reversed. We remand for a determination of remedy on the Title VII claim and for such further proceed-

ings as are not inconsistent with this opinion on the § 1983 claim.

REVERSED AND REMANDED.