Jeffrey M. GILLIGAN, an individual,
Plaintiff–Appellant,

v.

DEPARTMENT OF LABOR; Lynn
Martin, Secretary of Labor,
Defendants–Appellees.

No. 94–36070.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 18, 1995.

Decided April 10, 1996.

Barry L. Adamson, Lake Oswego, Oregon, for plaintiff-appellant.

Herbert C. Sundby, Assistant United States Attorney, Portland, Oregon, for defendants-appellees.

Before: WALLACE, NELSON and BRUNETTI, Circuit Judges.

WALLACE, Circuit Judge:

Gilligan appeals from a judgment entered after a court trial on his employment discrimination action against the Department of Labor (Department) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a). We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

## I

The Department's Portland office has employed Gilligan as a compliance specialist in its Wage and Hour division since 1976. In 1988, Gilligan applied for a newly created position: an additional assistant district director in the Portland office. He was not selected to be in the group of three finalists, which consisted of one man and two women. Gilligan, who is a white male, believed that the denial of this promotion resulted from illegal discrimination on the basis of gender and brought this Title VII action against the Department.

At trial, Robert Provencio, the Portland District Director, who was among those who had responsibility for hiring the new assistant director, testified that the hiring decision was made entirely on merit without reference to any applicant's gender. On the other hand, Gilligan presented compelling evidence that gender played a significant role in the decision. According to the testimony of the other assistant director in the Portland office, Ralph Knipe, the then Assistant Regional Administrator in Seattle, Wilbur Olson, instructed Knipe and Provencio, that "[t]he only thing that would be acceptable upstairs would be the selection of a female manager [for the new Portland position]."

The district court did not believe the Department's and Provencio's position that the applicants' gender played no role in the decision. Instead, the district court accepted Gilligan's allegation that gender did, in fact, play a role. However, because the Department had a well-established affirmative action plan, the district court held that the Department's consideration of applicants' gender was legal and dismissed the action.

## II

An applicant's gender can be considered as a factor in hiring "pursuant to an affirmative action plan that represents a moderate, flexible, case-by-case approach to effecting a gradual improvement in the representation of minorities and women." *Johnson v. Transportation Agency, Santa Clara County, California,* 480 U.S. 616, 642, 107 S.Ct. 1442, 1457, 94 L.Ed.2d 615 (1987) (*Johnson*). Affirmative action plans may consider gender as a factor as long as the plan does not "unnecessarily trammel[ ] the rights of male employees or create[ ] an absolute bar to their advancement." *Id.* at 637–38, 107 S.Ct. at 1454–55. Gilligan does not challenge the legitimacy of the Department's plan; therefore, we need not decide whether it "unnecessarily trammels" the rights of male employees or creates an advancement bar.

Instead, Gilligan argues that the hiring officials, Provencio and Olson, did not rely upon the plan. Pointing to Provencio's testimony that applicants' gender was not a factor, Gilligan concludes that the affirmative action plan was not relied upon and that any preference given to women was outside the plan and thus violative of Title VII. The mere existence of an affirmative action plan, he argues, cannot supplant the need to show that hiring decisionmakers relied, in fact, upon such a plan.

The district court, however, did not find that the Department's hiring officers relied upon the plan, nor did it hold that the mere existence of an affirmative action plan inoculates employers from Title VII liability. A close reading of the district court's opinion reveals that it found that the "employment decision ... appears consistent with the Department of Labor's affirmative action plan." The district court commented that even though Department officials never said they

relied upon the plan, "what they said [did not] control[ ]. It was what I found the facts to be." Thus, ruling that the statements of a few Department officials were not necessarily determinative of Department actions, the court examined the Department involvement as a whole. The court placed the hiring decision in the context of the entire Department's aggressive affirmative action plan and found that applicants' gender was a factor legally considered under the Department's affirmative action plan. We, therefore, understand the district court's disposition as resting upon an unusual proposition: even if the hiring official did not, in fact, rely upon an affirmative action plan, so long as the hiring was consistent with the plan when taking applicants' gender into his hiring decision, the Department did not violate Title VII.

We review legal questions in Title VII actions de novo and review a district court's underlying findings of fact under a clearly erroneous standard. *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995). The district court's finding as to the credibility of an employer's proffered reason for adverse employment action is reviewed under the clearly erroneous standard. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 523–25, 113 S.Ct. 2742, 2756, 125 L.Ed.2d 407 (1993) (*St. Mary's Honor Center*).

### III

Gilligan challenges the district court's decision on two grounds. First, relying on *Cerrato v. San Francisco Community College District,* 26 F.3d 968, 976 (9th Cir.1994), he asserts that the mere existence of an affirmative action plan cannot shield an employer from Title VII liability. He argues from this that the mere existence of an affirmative action plan cannot give rise to the presumption of *no* discriminatory intent. The district court, however, did not rule that the mere existence of an affirmative action plan establishes a presumption that it was relied upon. Rather, the district court found that the Department had such a plan in place and that the hiring officials' actions were consistent with it.

Gilligan further argues that the court could not ignore the evidence that the Department did not rely upon the plan. He points to the following testimony of hiring official Provencio:

Q: [D]id affirmative action and the department's affirmative action plan and goals play any part at all in your decision to select Mrs. [sic] Yerger for this job?

A. No. I selected the best person for the job.

Gilligan insists that the court found that the Department actually relied upon the affirmative action plan, and argues that this testimony renders the court's finding clearly erroneous. Gilligan mischaracterizes the district court's findings. We repeat that the district court did not find that the officials actually relied on the affirmative action plan. Rather, disbelieving Provencio's protestations, it found that the hiring decision actually did take into account applicants' gender, and that the decision was consistent with the Department's affirmative action plan.

### IV

This brings us to the central question on appeal: was the district court correct in ruling that hiring decisions consistent with an existing affirmative action plan—but made without the decisionmakers' actual reliance on the plan—are legal. Our analysis must focus on what "reliance" means in an institutional context. That determination is not easy.

*Johnson* states:

Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid.

480 U.S. at 626, 107 S.Ct. at 1449. Although *Johnson* states that for the purposes of bur-

den shifting, reliance on a plan is necessary, nothing in *Johnson* requires that a trial court accept as true one employee's "articulated" reason for a hiring decision. To determine the validity of proffered reasons in hiring decisions, a trial court must be free to move beyond the stated motives of one employee and to examine the hiring organization (here, the Department) as a whole. Comments indicating a lack of reliance, especially when made by the person in charge of the hiring, are important, but not necessarily dispositive of whether the employer (the whole Department) practiced illegal discrimination.

▬ Nor does the Department lose by default because the district court rejected the Department's proffered reason for the disparate treatment, i.e., merit. The Supreme Court has stated that even if an employer's proffered reason is found pretextual, victory is not handed to the plaintiff as punishment for the employer's "fibbery." *See St. Mary's Honor Center*, 509 U.S. at 521–23, 113 S.Ct. at 2755. Thus, Gilligan retained the burden to show illegal discrimination. *See id.*

Gilligan did not show illegal discrimination. While the district court did accept Gilligan's claim that gender was a factor in the hiring officials' decision, the use of gender as a factor does not necessarily constitute illegal discrimination. The Department was free to consider gender as a factor pursuant to an affirmative action program. *Johnson*, 480 U.S. at 640–41, 107 S.Ct. at 1456–57. What is unclear is whether the Department's hiring officials actually had to rely on the affirmative action plan or whether their consideration of gender would be legal as long as they acted consistently with the plan.

▬ We rule that in an institutional setting, it is not necessarily determinative whether the hiring officials actually relied upon the plan as long as they acted consistently with it. We reach this decision because the focus must be on the hiring decision itself and the hiring organization as a whole. In result, a hiring official who acts consistently with a plan is indistinguishable from one who actually relies upon the plan. Moreover, the burden placed on male or nonminority applicants is identical in either instance.

Our ruling should not be interpreted as allowing hiring officials to engage in illegal discrimination as long as such discrimination could be deemed consistent with an affirmative action program. We stress that the district court found that gender was only "a factor," not the exclusive factor. *See id.* at 638, 107 S.Ct. at 1455 ("the Plan merely authorizes that consideration be given to affirmative action concerns ... [n]o persons are automatically excluded from consideration") (emphasis omitted).

▬ If the district court had found that gender was the exclusive factor and that the position Gilligan sought was, in fact, unavailable to him because he was male, then the Department would be guilty of illegal discrimination. No hiring official may make decisions using gender as an exclusive factor. Moreover, any affirmative action program which specifically provides for such discrimination or in practice results in such discrimination is illegal. *Id.* at 637–38, 107 S.Ct. at 1454–55 (affirmative action programs are illegal if they function as an "absolute bar" to the advancement of non-preferred groups). The district court, however, found that this type of discrimination was not present, despite the testimony of the hiring officials.

▬ Finally, Gilligan argues that the affirmative action plan cannot be considered because he never challenged it or made it an issue; therefore, Gilligan concludes that the affirmative action plan cannot be used to fulfill the Department's evidentiary burden under *Johnson*. We need not reach that issue; once the case is tried, we do not focus on the burden of proof shifting rules, but analyze whether Gilligan has met his burden of proving a Title VII violation. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983).

## V

▬ Last, Gilligan asserts that under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), he is entitled to judgment in his favor. Under *Price Waterhouse* burden shifting, if the De-

partment's articulated reason for hiring is found pretextual and gender is found to have, in fact, played a role in the hiring decision, then the Department may avoid liability "only by proving that it would have made the same decision even if it had not allowed gender to play such a role." *See id.* at 244–45, 109 S.Ct. at 1787–88. Because the district court did not accept the Department's position that merit was the sole consideration in the hiring decision, Gilligan argues that the case became a mixed-motive case and that the Department failed in its burden to show that it would have made its decision even if applicants' gender had not been a factor. However, because the district court properly concluded that gender was only taken into account as allowed by the affirmative action plan, the Department never considered gender illegally. The mixed-motive analysis is limited to employment decisions where legal and illegal motivations are involved. Here, gender was legally used as a factor in the disputed employment decision; thus, the mixed-motive analysis is inapplicable.

AFFIRMED.