VINCE CHHABRIA, United States District Judge
Noe Adalberto Silva and Veronica de Silva, the plaintiffs, and the City of San Pablo have filed cross-motions for summary judgment. Summary judgment is granted to San Pablo on the section 1983 claims. The Court declines to continue to exercise supplemental jurisdiction over the remaining state-law claims.
The Section 1983 Claims
Even if a jury found that San Pablo police officers violated the Fourth and Fourteenth Amendments when entering Silva and de Silva's apartment and using a police dog to restrain Silva - as a reasonable jury certainly could - the plaintiffs have not brought forward sufficient evidence to show San Pablo can be held liable for those violations.
The plaintiffs primarily argue that San Pablo is liable for the alleged constitutional violations because Lisa Rosales, San Pablo's Chief of Police at the time of the incident, ratified the officers' conduct by signing off on a "use of force memorandum" prepared after the incident.
A municipality can sometimes be held liable under section 1983 for the conduct of a non-policymaking official if a municipal policymaker ratifies that conduct. Although Ninth Circuit case law on the ratification doctrine is somewhat unclear, a fundamental principle of section 1983 municipal liability is that a city is only liable if its conduct was the cause in fact and proximate cause of the constitutional violation that the plaintiff suffered. See, e.g. , Trevino v. Gates , 99 F.3d 911, 918 (9th Cir. 1996). Thus, a policymaker's approval of a subordinate's continuing constitutional violation can make a municipality liable for the subordinate's violation. In that circumstance, the policymaker's ratification has in some sense "subjected, or cause[d] to be subjected," the plaintiff to the continuing constitutional harm. 42 U.S.C. § 1983 ; see Christie v. Iopa , 176 F.3d 1231, 1239 (9th Cir. 1999) ; see also id. at 1240 (holding that city could be held liable where jury could conclude policymaker "affirmatively approved of [subordinate's] alleged ongoing constitutional violations" after learning of these violations); Fuller v. City of Oakland , 47 F.3d 1522, 1526 (9th Cir.1995). But a municipality cannot be held liable merely because one of its policymakers has condoned or approved of a city employee's completed, irreversible conduct; the after-the-fact *1201 approval cannot be either a cause in fact or proximate cause of the violation suffered by the plaintiff. Cf. Kanae v. Hodson , 294 F.Supp.2d 1179, 1191 (D. Haw. 2003). And here, Rosales clearly could not have undone any of alleged violations, even if she had concluded after the fact that the officers' conduct when responding to the reported burglary at the apartment did not comply with city's written use of force policy.
Some Ninth Circuit cases use the term ratification to describe a different means of establishing municipal liability. A policymaker's after-the-fact approval of her subordinate's conduct can in some circumstances be used as evidence that the city had a pre-existing policy or custom that caused the alleged constitutional violations. See, e.g. , Larez v. City of Los Angeles , 946 F.2d 630, 647 (9th Cir.1991). But here, the plaintiffs don't argue that Rosales's approval of the use of force memorandum is evidence that San Pablo had a specific preexisting policy or custom that caused the alleged violations of Silva and de Silva's Fourth and Fourteenth Amendment rights.
In response to San Pablo's motion for summary judgment, the plaintiffs also briefly assert that San Pablo can be liable under section 1983 for the allegedly unconstitutional use of a dog to restrain Silva because "the attack was pursuant to San Pablo's 'find and bite' policy." Dkt. No. 77, Pls.' Opp. & Reply at 21; see also Dkt. No. 74-2, Blechman Decl. Ex. S, Policy 318, Canine Program. However, a plaintiff must do more than make vague gestures towards a policy that might address, in general terms, the category of conduct (such as, "use of force" or "use of a police dog") that an officer engaged in. If this were enough, Monell would "become a dead letter" in excessive force cases; all police agencies have general policies on the use of force. City of Oklahoma City v. Tuttle , 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion); see Blechman Decl. Ex. W., Bogardus Dep. at 46:8-15. To create a genuine fact dispute about whether a policy caused officers to commit the constitutional violation, a plaintiff must explain how the policy could have directed the officers to engage in the specific conduct at issue, or how the policy could have at least steered the officers into choosing that particular course of conduct. Or the plaintiff must provide evidence that the officers believed that the policy directed them into the specific conduct at issue. See Van Ort v. Estate of Stanewich , 92 F.3d 831, 837 (9th Cir. 1996) ; see also Tuttle , 471 U.S. at 823, 105 S.Ct. 2427 (plurality opinion) ("Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official; for example, Rotramel would never have killed Tuttle if Oklahoma City did not have a 'policy' of establishing a police force. But Monell must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was 'caused' by the municipal 'policy.' At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."); id. at 831, 105 S.Ct. 2427 (Brennan, J., concurring) (stating that municipality can be held liable where a "policy or custom [ ] would foreseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right").
Although a reasonable jury could certainly find that the police officers acted with excessive force when they used a dog to restrain Silva in his own apartment, the plaintiffs offer one bare paragraph in their opposition brief on the question of whether *1202 the officers' conduct could have been caused by the dog bite policy. In that paragraph, they seem to assume that municipal liability exists whenever a dog bite policy exists and whenever someone is bitten by a police dog. They have made no attempt to show how San Pablo's Canine Program policy, which seems to allow the use of a dog only when that use would be reasonable, "foreseeably and avoidably cause[d]" the alleged excessive force. Tuttle , 471 U.S. at 831, 105 S.Ct. 2427 (Brennan, J., concurring). Nor do they appear to have done any meaningful discovery into the matter, despite being given ample opportunity to do so. Cf. Ciampi v. City of Palo Alto , 790 F.Supp.2d 1077, 1105 (N.D. Cal. 2011). In fact, the plaintiffs' expert opined that the officers should not have used a dog "because it was unnecessary while serving to increase the risk of injury to others, including the officers," and because the officers already knew where Mr. Silva was located, negating any need to use a dog to search for Mr. Silva. Cook Decl. Ex. V, Bogardus Decl. ¶¶ 31-32. If the jury accepted this testimony, it would also be compelled to find that the officers were violating the Canine Program policy; that policy allows the police to use a dog to search for a suspect or to stop a suspect attempting to evade arrest "where such level of force is appropriate." Blechman Decl. Ex. S, Policy 318, Canine Program at § 318.2(a)-(b). And of course, if the police officers were violating the Canine Program policy by using a dog to restrain Silva, that same policy could be neither the cause in fact nor the proximate cause of his injuries.
Remaining Claims
The plaintiffs have three remaining claims, all under state law: a claim directly under Article I, Section 13 of the California Constitution ; a claim under California Civil Code section 3342 ; and a Bane Act claim premised on violations of the California Constitution, California Penal Code, California Civil Code, and the U.S. Constitution. The Court does not have original jurisdiction over any of these claims. See Rodriguez v. City of Fresno , No. 1:16-CV-268-LJO-SAB, 2016 WL 1138188, at *2-3 (E.D. Cal. Mar. 23, 2016).
Usually, the Court would not even consider declining to exercise supplemental jurisdiction at this stage. But this is an unusual case, both in terms of the plaintiffs' litigation choices until now and the novelty of the state law claims they assert.
With respect to the plaintiffs' litigation choices, the reason no federal claim remains in this case, despite the fact that the officers may well have violated the U.S. Constitution, is that the plaintiffs neglected to name - or made the highly unusual choice to refrain from naming - the individual officers as defendants. As discussed in a prior order, the plaintiffs inappropriately waited until after discovery was closed, and after the officers were deposed, before attempting to add them as defendants. Dkt. No. 86, Order Den. Mot. for Leave to Amend. Had the plaintiffs done what most people do and named the individual officers at the outset (or as soon as practicable), even if San Pablo won at summary judgment on municipal liability, federal claims would remain, and those claims would go to trial with the state claims. As it is, however, the plaintiffs' failure to name the individual officers (and then to inappropriately attempt to add them after discovery had closed) has unnecessarily prolonged this litigation. And it has put the Court in a position where it must decide whether to adjudicate certain state law claims in the absence of independent federal jurisdiction.
These claims are novel and complicated. With respect to the claim under the California Constitution, it seems likely *1203 the California courts would determine that Article I, Section 13 creates a private right of action for a damages remedy, but they have not yet decided this important issue of state law. Dkt. No. 49 at 2; see also Katzberg v. Regents of Univ. of Cal. , 29 Cal.4th 300, 322-23, 323 n.21, 127 Cal.Rptr.2d 482, 58 P.3d 339 (2002) ; Millender v. County of Los Angeles , No. 05-CV-2298-DDP, 2007 WL 7589200, at *39 (C.D. Cal. Mar. 15, 2007).
With respect to the claim under California Civil Code section 3342, which makes a dog owner strictly liable in most circumstances where his dog has injured another person by biting them, a "governmental agency using a dog in police work" is not liable when the bite occurs while the dog is assisting "[i]n the apprehension or holding of a suspect where the employee has a reasonable suspicion of the suspect's involvement in criminal activity," as well as in certain other circumstances not at issue here. Cal. Civ. Code § 3342(b). As with many laws, there is an exception to this exception. The limit on liability only applies if the governmental agency has "adopted a written policy on the necessary and appropriate use of a dog for the police or military work." Cal. Civ. Code § 3342(d). It is not clear whether a city must merely have "a policy on the necessary and appropriate use of a dog," as the plain language of the statute suggests, or whether the city's officers must be complying with the policy, as the underlying purpose of the requirement might suggest. See, e.g. , 1988 Cal. Legis. Serv. 298, A.B. 2973, S. Rules Comm. Rpt. at 2, https://www.cand.uscourts.gov/filelibrary/3463/1988-Cal.-Legis.-Serv.-298-Cal.-Civil-Code-334.pdf [https://perma.cc/P4A7-TY4A] (noting that exception to liability was intended to protect public entities and its officers from suits where "the arrest was perfectly lawful, did not involve the use of unreasonable force"). If it is the former, then it appears summary judgment should be granted to San Pablo; if it is the later, a jury could reasonably determine that San Pablo should be held liable. And again, the state courts have not addressed the question.
Finally, the Bane Act claim is based, at least in part, on the officers' failure to adequately knock and announce their presence in Spanish before entering Silva's apartment. The plaintiffs assert that this violated both the California and U.S. Constitutions. See Dkt. No. 66, Pls' Mot. at 13-16. Although both Article I, Section 13 and the Fourth Amendment are assessed under a standard of reasonableness, and the two provisions are often interpreted as providing the same substantive protections, the plaintiffs note that California courts have at time interpreted Article I, Section 13 to provide broader protections against unreasonable searches and seizures than the Fourth Amendment. See People v. Buza , 4 Cal.5th 658, 684-86, 230 Cal.Rptr.3d 681, 413 P.3d 1132 (2018) (describing California Supreme Court's past practice when interpreting Article I, Section 13 in light of Fourth Amendment); Dkt. No. 66, Pls' Mot. at 9; Dkt. No. 77, Pls' Opp. & Reply at 24-25; see also People v. Buza , 4 Cal 5th at 701-704 (Liu, J., dissenting); id. at 707-08 (Cuéllar, J., dissenting) ("[W]ithin the specific context of search and seizure of arrestees, we have been quite explicit in holding that [A]rticle I, [S]ection 13 provides greater protection than does the Fourth Amendment.").
The plaintiffs have a reasonable argument that, under the circumstances of this case, the San Pablo police officers failed to adequately account for the possibility that Silva did not understand English. See Dkt. No. 66, Pls' Mot. at 9, 16 n.1. When the officers were announcing their presence at the apartment, dispatch was already on *1204 the phone with one of the apartment's occupants; although the police had not yet communicated with the occupant because the occupant did not speak English and there was not yet a translator on the line, the police knew the occupant spoke Spanish. This alone should have alerted the officers to the possibility that whoever was in the apartment also only spoke Spanish. (The neighbor who had reported the possible burglary only minutes earlier also spoke Spanish and needed a translator to speak with the police.) And the police were operating in a community where many people speak Spanish but not English. Of the roughly 28,000 people who live in San Pablo, slightly over half speak Spanish. And of the around 10,500 non-senior adults who speak Spanish in San Pablo, 60 percent - around 6,500 - speak English less than "very well." United States Census Bureau, 2012-16 American Community Survey: S1601, Language Spoken at Home for San Pablo, Cal., factfinder.census.gov/bkmk/table/1.0/en/ACS/16_5YR/S1601/1600000US0668294 [perma.cc/P8 R5-QH6U?type=image]. There is an argument that the officers violated the Fourth Amendment by failing to account for the significant possibility that the occupant of the apartment did not speak or understand English. But perhaps there is an even stronger argument that they violated the California Constitution. Thus, the Bane Act claim presents novel and important questions of state law as well.[1]
* * *
For all these reasons, judgment will be entered: (i) for San Pablo on the section 1983 claims; and (ii) dismissing the state law claims against San Pablo without prejudice to bringing them in state court.
IT IS SO ORDERED.

Incidentally, in their summary judgment papers, the plaintiffs made only passing reference to this issue as well. They did not argue at all that the failure to account for the likelihood that the occupant spoke only Spanish was the product of a municipal policy, custom, or practice. They merely raised the Spanish language issue in arguing that the officers (whom they had not named as defendants) violated the Fourth Amendment by the way they entered the apartment.