Keola N. KANAE, Plaintiff,

v.

Kahiki M.H. HODSON, County of Hawai'i, and John Does 1–10, Defendants.

Civil No. 02–00399 SOM/LEK.

United States District Court, D. Hawai'i.

Nov. 5, 2003.

Eric A. Seitz, A Law Corporation, Honolulu, HI, for Plaintiff.

Joseph M. Kamelamela, Office of the Corporation Counsel Big Island, Hilo, HI, for Defendants.

*ORDER DENYING DEFENDANT KAHIKI HODSON'S RENEWED MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING DEFENDANT COUNTY OF HAWAII'S RENEWED MOTION FOR SUMMARY JUDGMENT*

MOLLWAY, District Judge.

## I. INTRODUCTION.

Plaintiff Keola N. Kanae alleges that Defendant Kahiki Hodson and Defendant County of Hawaii ("the County") are liable under 42 U.S.C. § 1983. Kanae asserts that Hodson, a police officer, used excessive force when he shot Kanae while apprehending him. Kanae, claiming that the County should have reprimanded Hodson, says that the failure to reprimand demonstrates a County policy for which the County is liable.

Both Hodson and the County, having been previously denied summary judgment, have filed renewed motions for summary judgment. Because Hodson has not shown that he has qualified immunity from Kanae's excessive force claim, Hodson's motion is denied. However, because Kanae has not raised a genuine issue of fact as to whether the County ratified Hodson's actions by doing a "sham" investigation into the shooting, and because Kanae has not opposed summary judgment as to any other claim asserted against the County, the court grants the County's motion for summary judgment.

## II. *BACKGROUND.*

Hodson is a police officer for the County of Hawaii. Declaration of Kahiki Hodson (Mar. 7, 2003) ¶ 1. The incident that is the subject of this action occurred in the evening of June 14, 2001.

Kanae and Shaun Mika Thompson were both wanted by the police for various criminal offenses. Hodson had received a police briefing in which he was told that Kanae and Thompson "possessed firearms, including a hand gun and a sawed off rifle." Hodson Decl. ¶ 3. Hodson had heard that they "would not be taken alive," and he had seen pictures of Kanae and Thompson. *Id.*

At around 7:35 p.m., Hodson responded to a report of a gunshot in the Ainaloa Subdivision. Hodson and three other police officers met at the entrance to the subdivision, at the intersection of Route 130 and Ainaloa Boulevard. They pulled their cars to the side of the road to put on their bulletproof vests. Hodson Decl. ¶ 7.

As Hodson and Officer Iris McGuire were talking, they saw a car driven by an elderly woman coming toward them. An elderly man, later identified as Arnold Westphall, was in the front passenger seat. Hodson says that the elderly woman, later identified as Janet Judy, had her head out the window and was calling to the police officers for help. Hodson Decl. ¶ 8.

Hodson and McGuire moved toward the car and saw a man in the back seat behind Judy, ordering her to keep driving.[1] Hodson recognized the man in the back seat on the driver's side as Kanae. Hodson Decl. ¶ 11. Another man in the back seat was pointing something at Judy's head. *Id.* ¶ 12.

Hodson drew his gun. *Id.* ¶ 13. McGuire told the passengers in the back seat to get out of the car slowly with their hands up. *Id.* at 14. Hodson says he heard McGuire yell that they had a gun. *Id.* According to Hodson, at about the same time, the back car door opened quickly. *See id.* ¶ 13 ("At the same time that she said that they had a gun, I saw the left back door opened quickly...."); Hodson Depo. at 41 ("I believe somebody yelled gun and the door flinged open at the same time."). Hodson says that Kanae "lunged" out the door toward McGuire. Hodson says he heard one gun shot coming from the direction of the car. *Id.* ¶ 13. Simultaneously, Hodson saw McGuire stumble. *Id.;* Hodson Depo. at 41–42 ("a shot was fired and Officer McGuire started falling down").

Hodson says that, when Kanae "lunged" out of the car, Hodson could not see Kanae's right hand, *see* Hodson Decl. ¶ 14, but Hodson also admits that he did not see Kanae holding any weapon. Hodson Depo. at 44. These statements are consistent with McGuire's account. According to McGuire, "Keola [Kanae] put his hands

---

1. Although exactly what was said is unclear, the essence of the statement by the man in the back seat was that Judy should continue driving. *Compare* Hodson Decl. ¶ 11 (the man yelled: "Go already. Move the fucking car. Go.") *with* Deposition of Kahiki M.H. Hodson (Aug. 19, 2003) at 40 (the man yelled: "[G]o or I'll kill you or something to that effect.").

down and I didn't see anything, but he was getting, jumping out of the car." Statement of Officer Iris McGuire (June 15, 2001) at page 8 of 15. Hodson says that he then shot Kanae once. Hodson Decl. ¶¶ 14–15; Hodson Depo. at 42–43.

According to Hodson, after he shot Kanae, Kanae raised his hands. Hodson Decl. ¶ 16; Hodson Depo. at 45. Hodson then heard another shot coming from inside the car. Apparently, Thompson had shot himself in the head. Hodson Decl. ¶ 18.

Kanae's description of the shooting differs from Hodson's. In his September 2003 declaration, Kanae says that both shots in the car were Thompson's shots aimed at himself. Kanae says that, after Thompson shot himself the first time, Kanae immediately "opened the door, raised [his] hands out the door and in the air, and exited the vehicle as ordered." Declaration of Keola N. Kanae (Sept. 30, 2003) ¶ 6. According to Kanae, "[a]s [he] was stepping away from the vehicle with [his] hands in the air, Officer Kahiki Hodson fired his weapon[,] striking [Kanae] in the chest." *Id.* ¶ 7. Kanae says that, "[a]t no time ... did [he] ever threaten, or otherwise challenge any of the officers present at the scene." *Id.* ¶ 11. Kanae's September 2003 declaration does not describe the speed with which Kanae was getting out of the vehicle.

At the time of the shooting, Hodson had been a police officer for more than a decade. Hodson Decl. ¶ 19. He was trained in the use of firearms and, on November 15, 2000, was qualified on the gun he fired at Kanae. *Id.* ¶ 20. A copy of the County's "use of force" regulations is attached to Hodson's Declaration as Exhibit 1. *See* General Order No. 804. In relevant part, those regulations state:

(III.) A. Parameters for Use of Deadly Force.

1. Police officers are authorized to discharge their firearms in order to:

a. Protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.

*Id.*

A review board consisting of Assistant Chiefs Thomas Hickcox, Wendall Paiva, and Lawrence K. Mahuna, who apparently was also the Acting Police Chief, examined the circumstances surrounding Hodson's shooting of Kanae. Declaration of Police Chief Lawrence K. Mahuna (Oct. 30, 2003) ¶¶ 4–5; To/From from Lawrence K. Mahuna, Assistant Chief, Acting Police Chief, to Kahiki Hodson (May 8, 2002). On March 1, 2002, the review board issued its "Special Review Board Findings, Officer Kahiki Hodson, SRB # 2002–1, Discharge of Firearm, June 14, 2001 (March 1, 2002)." There is no dispute that the review board found that Hodson's actions fell within the police department's "use of force" regulations. *See id.* ("The Board concluded that no procedural changes are in order or that any training requirements require update and changes and that your actions were within the parameters established by General Order 804, Use of Force. Therefore, no administrative action is being taken.").

The review board examined "the entire investigative files concerning the shooting by Hodson of Kanae." Mahuna Decl. ¶¶ 7–8. The files included the To/From by Moses Kaoiwi, Jr., Detective, Internal Affairs, to James S. Correa, Police Chief (December 19, 2001) and all documents attached thereto ("I.A.Report"). *Id.* Kaoiwi, the Internal Affairs detective who investigated the shooting, examined statements by all of the officers at the scene of the shooting, the two people who were allegedly held in the car by Kanae and Thomson, and other witnesses. The I.A.

Report noted that Kanae had told an emergency medical technician that "I was coming out of the car and had my hands up when they just shot me." *Id.* at 6 (Bates stamp 0706); *see also* Statement of Officer Viengsavanh Sivankeo (June 14, 2001) at 2 (Bates stamp 0796). Besides Hodson's and McGuire's statements, there were no other accounts of how Kanae exited the car. For example, Judy apparently did not see Kanae leave the car. *See* Statement of Janet Judy (June 14, 2001) ("And the young man who was behind me got out of the car and[,] *when I looked over* [,] he had, the officers had him on the ground face down in front of my car.") (emphasis added) (Bates stamp 1028). Westphall's statement does not describe how Kanae exited the car either. *See* Statement of Arnold Westphall (June 14, 2001) at 2 ("I thought he shot me, but could have felt something on my ear, that's when I opened the door and kinda fell to the ground like. We still trying to figure out if he hit me, that's when I moved away to the back of the car. That's about it.") (Bates stamp 1035). Neither Judy not Westphall was directly asked to describe how Kanae exited the car.

The police did not interview Kanae because he was a suspect and had retained counsel. *See* Statement Richard Miyamoto (June 21, 2001) at 2 ("I was notified that Keola KANAE had obtained the services of a lawyer.... Due to this information in regards to KANAE's retention of an attorney, no interview with him was conducted.") (Bates stamp 0861); I.A. Report at 16 ("06–21–01: at 1346 hours, I called [the law firm of] KOSHIBA, AGENA, and KUBOTA at (808)532–9595 to see if they would allow me to speak with Keola Kanae.... Kubota ... believes that before allowing KANAE to speak, they would need to see all of the information first. He indicated that most likely Mr. KOSHIBA [, Kanae's criminal attorney,] would determine whether he would allow KANAE to speak after the arraignment and all the information available concerning the incident.") (Bates stamp 0753–54).

## III. *SUMMARY JUDGMENT STANDARD.*

The standard for summary judgment was previously stated in the court's May 30, 2003, order. That standard is incorporated herein by reference.

## IV. *ANALYSIS.*

### A. *Hodson's Qualified Immunity Defense.*

■ Hodson argues that he has qualified immunity with respect to Kanae's claims. Qualified immunity bars claims against government officials in their individual capacities if their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Manhattan Beach Police Officers Ass'n v. City of Manhattan Beach,* 881 F.2d 816, 818 (9th Cir.1989) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The doctrine protects government officials from their exercise of poor judgment, and fails to protect only those who are "plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The purpose of qualified immunity is to protect officials from undue interference with their duties and from potentially disabling threats of liability. *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 70 F.3d 1095, 1098 (9th Cir.1995).

■ Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). For that reason, the Supreme Court has cautioned that a ruling on a

qualified immunity defense "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Id.*

*Saucier* held that the qualified immunity analysis is a two-step process. First, the court, viewing the facts alleged in the light most favorable to the party asserting an injury, must determine whether those facts show that the defendant's conduct violated a constitutional or statutory right. *Id.* at 201, 121 S.Ct. 2151. If no constitutional or statutory right would have been violated by the alleged actions, a defendant has qualified immunity. On the other hand, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This inquiry "must be taken in light of the specific context of the case, not as a broad general proposition." *Id.* If the law did not put the official on notice that his or her conduct would be clearly unlawful, the official has qualified immunity from the claim. *Id.* at 202, 121 S.Ct. 2151.

### 1. Step 1: Was there a Constitutional Violation?

Kanae's Complaint alleges that Hodson used excessive force in apprehending him. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).[2] "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment re-

quires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (internal quotations omitted).

The Fourth Amendment's "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* In other words, not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Id.* The "reasonableness" inquiry in an excessive force case is an objective one. The "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

 Under this rubric, deadly force may be used when an officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others. *Haugen v. Bros-*

---

**2.** The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall

issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*seau,* 339 F.3d 857, 863 (9th Cir.2003) (quoting *Tennessee v. Garner,* 471 U.S. 1, 11–12, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). It is not enough for an officer simply to state that he or she feared for his or her safety or the safety of others. Instead, "there must be objective factors to justify such a concern." *Haugen,* 339 F.3d at 865.

 Taken in the light most favorable to Kanae, the objective evidence raises questions of fact as to whether Kanae posed a threat of serious physical harm to the officers or others. Although a shot had just been fired from inside the car, Kanae says that he had gotten out of the car with his hands "raised ... out the door and in the air." Kanae claims that he was shot as he was stepping away from the car with his "hands in the air." Kanae. Decl. ¶¶ 6–7. Kanae further contends that he did not threaten or otherwise challenge any of the officers. *Id.* ¶ 11.[3] Assuming these circumstances, a reasonable jury could conclude that Hodson's conduct violated Kanae's Fourth Amendment rights. *See Gray Hopkins v. Prince George's County, Maryland,* 309 F.3d 224, 231 (4th Cir.2002) (noting that a trier of fact could find that a Fourth Amendment violation occurred when a suspect was shot while he was standing with his hands above his head, was not resisting arrest, and was not posing a threat to the safety of the officers or others).

2. *Step 2: Was the Constitutional Right Clearly Established?*

Having determined that, on a favorable view of the parties' submissions, Kanae could make out a Fourth Amendment vio-

lation, the court must next determine whether the right was clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* In other words, even if Hodson "made a reasonable mistake about what the law requires, [he] is immune from suit." *Haugen,* 339 F.3d at 873. "Officers are not liable when they err in borderline cases." *Id.* at 874.

Deadly force is only permissible when an officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others. *Haugen,* 339 F.3d at 863 (quoting *Garner,* 471 U.S. at 11–12, 105 S.Ct. 1694). In the present case, the evidence, examined in the light most favorable to Kanae, does not present a borderline case for which summary judgment would be appropriate. Although Hodson may have been under the impression that McGuire had been shot by Kanae, Kanae says that he was shot after he had got out of the car, as he was stepping back with his hands in the air. In Kanae's version of events, Hodson could see Kanae's hands in the air and therefore knew that shooting Kanae would clearly violate Kanae's Fourth Amendment rights. Accordingly, the court concludes that Hodson has not established that he is entitled to summary judgment on qualified

---

**3.** Hodson argues that Kanae does not sufficiently describe the position of his hands. Hodson says that having "hands in the air" could mean that Kanae had his hands either above his head or stretched out in front of him in a manner that Hodson could not see. Because the court interprets the facts in the

light most favorable to the nonmoving party for purposes of this motion, the court interprets Kanae's statement that his hands were "raised ... out the door and in the air" to mean that Kanae's hands were at or above his head level as he was getting out of the car, where they could be seen by Hodson.

immunity grounds. Hodson's motion is denied.

### B. *County Liability Under § 1983.*

Kanae alleges that the County violated 42 U.S.C. § 1983 by failing and refusing to properly train, supervise, and/or discipline Hodson. Complaint ¶ 27. The County's motion seeks summary judgment on each of these claims. The Opposition, however, only opposes the motion on the theory that the County ratified Hodson's action by failing to discipline him.[4]

> Section 1983 provides, in relevant part: [E]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party in an action at law, suit in equity or other proper proceeding to redress.

42 U.S.C. § 1983.

Local governmental bodies such as the County are "persons" that may be sued under § 1983. *See Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, counties are only liable for injuries that arise from an official policy or custom. *Id.* at 694, 98 S.Ct. 2018 (no respondeat superior liability); *accord City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct.

1197, 103 L.Ed.2d 412 (1989) (a county is liable under § 1983 only when its policy or custom causes the injury).

Municipal liability may be established in one of three ways.

First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir.1992) (citations and internal quotations omitted). In the Opposition, Kanae only argues that the County's liability arises under the third theory of liability— ratification. After the shooting, a review board conducted an investigation. *See* Special Review Board Findings, Officer Kahiki Hodson (March 1, 2002). Acting Police Chief Lawrence K. Mahuna informed Hodson that, based on the review board's findings, "no procedural changes

---

4. With respect to Kanae's failure to train claim, the County asserts that Hodson was trained as to the County's "use of force" regulations. With respect to Kanae's failure to supervise claim, the County asserts that there is no evidence of any "nonsupervision." Kanae did not submit any written opposition to these arguments. At most, Kanae stated at the hearing on the present "renewed" motion that the court should review his opposition to the County's previous motion for summary judgment. The court has reviewed Kanae's

earlier opposition and notes that it only requested a Rule 56(f) continuance of the hearing so that Kanae could conduct discovery. As Kanae has failed to raise a question of fact as to whether Hodson was properly trained and supervised, and as Kanae has had sufficient time to conduct discovery and has not submitted any statement as to what he expects would be shown if further discovery were taken, summary judgment is granted in favor of the County on Kanae's failure to train and supervise claims.

are in order ... [and no] training requirements require update and changes and ... [Hodson's] actions were within the parameters established by General Order 804, Use of Force." To/From from Lawrence K. Mahuna, Assistant Chief, Acting Police Chief, to Kahiki Hodson (May 8, 2002).

Kanae argues that the County ratified Hodson's actions when it determined that Hodson acted appropriately and took no adverse action against Hodson. Based on his expert's report, Kanae argues that "the investigation and review of the incident totally failed to address any of [the] inconsistencies [in Hodson's account of the shooting] and simply ratified the objectively unreasonable use of deadly force." Opposition at 12. Kanae's expert, D.P. Van Blaricom, reached this conclusion based on what were, in his opinion, internal inconsistencies.

In his report, Blaricom first assumes that Kanae was standing outside the car with his hands in the air when he was shot. Expert Report at 2 ("the shooter saw plaintiff outside of the vehicle with his hands up when he heard the shot from inside the vehicle"). The evidence presented to the board reviewing the shooting was conflicting on this point. Hodson claimed that he could not see Kanae's right hand. Statement of Officer Kahiki Hodson (June 14, 2001) at 13 ("I seen all of his left side.... I couldn't see anything of his right."). However, Kanae told an emergency medical technician that Kanae "had [his] hands up when they just shot me." Sivankeo Statement at 2.

According to Blaricom, the review board should have found Hodson's account inconsistent because, on page 12 of his statement to investigators, Hodson "admittedly '*thought Iris* (Officer McGuire) *got shot AFTER* (emphasis supplied) *I shot.*'" Expert Report at 3 (italics, bold face, capitals, and parentheticals all by Blaricom). Blaricom reads this statement in isolation, ig-

noring other parts of Hodson's statement. Hodson was asked: "Initially, you thought Iris was being shot at?" Hodson responded: "No, I thought Iris got shot after I shot." This response came after Hodson had explained that "one shot was heard from within the car. And *then* I just shot at him." Statement of Officer Kahiki Hodson (June 14, 2001) at 2 (emphasis added). Hodson's statement regarding the timing was consistent with McGuire's statement. Statement of Officer Iris McGuire (June 15, 2001) at 7 ("I saw Mika [Thompson] fall back, he got shot at this time. At that time, as soon as I heard that shot, I heard another shot.").

Read in context, Hodson's statement that he "thought [McGuire] got shot after [Hodson] shot" Kanae is not necessarily inconsistent with Hodson's statement that he heard one shot from within the car and then shot Kanae. Both statements were oral; they were not drafted by counsel or carefully written out and edited by Hodson. Hodson's reference to when he "thought" McGuire was shot may have been a reference to when he developed his thought, not a reference to when he fired a shot in relation to when the other shot was fired. That is, "I thought Iris got shot after I shot" may have meant "Although I had heard a shot from inside the car before I fired my weapon, it did not occur to me that Iris had been shot until after I shot Kanae."

 While the court must view the facts in the light most favorable to Kanae, inferences drawn from the underlying facts must be reasonable. *See Orin v. Barclay,* 272 F.3d 1207, 1213 (9th Cir.2001) (in considering a motion for summary judgment, all reasonable inferences are to be drawn in favor of the nonmoving party); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir.1987) ("Inferences may be drawn from underly-

ing facts that are not in dispute, such as background or contextual facts, and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party. Assuming the existence of these underlying facts, however, an inference as to another material fact may be drawn in favor of the nonmoving party only if it is 'rational' or 'reasonable' and otherwise permissible under the governing substantive law.").

Blaricom's report is not a firsthand observation of what happened. Blaricom's report is an interpretation of others' statements. In concluding that Hodson's statement that he "thought Iris got shot after [he] shot" went to the timing of both shots, Blaricom's report ignores Hodson's use of the word "thought" and Hodson's actual knowledge at the time the statement was made that McGuire had not been shot. Accordingly, Blaricom's conclusion that Hodson was saying he fired first is questionable. The record at the very least suggests that what Blaricom identifies as an inconsistency is not necessarily an inconsistency, and if the County did not consider Hodson's account inconsistent, the County's interpretation was not necessarily a failure to take appropriate action.[5]

Whether a municipality's investigation evidences a policy giving rise to § 1983 liability has been the subject of discussion in a line of Ninth Circuit cases. In *McRorie v. Shimoda*, 795 F.2d 780 (9th Cir. 1986), for example, the Ninth Circuit recognized that, for purposes of municipal liability under § 1983, a "[p]olicy or custom may be inferred if ... officials took no

steps to reprimand or discharge the guards, or if they otherwise failed to admit the guards' conduct was in error." *Id.* at 784 (citing *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 171–72 (5th Cir. 1985)). *McRorie* arose in the context of a motion to dismiss granted by a district court without explanation. *Id.* at 782. The Ninth Circuit reversed and remanded with the direction that the plaintiff "be given the opportunity to amend his complaint to make allegations about the officials' conduct." *Id.* at 784. *McRorie* teaches that a municipality may have § 1983 liability for failing to reprimand an employee. *McRorie* does not, however, go so far as to hold that a county must be following a policy giving rise to § 1983 liability whenever its investigation fails to lead to a reprimand or discharge of an employee.

Because *McRorie* relied on *Grandstaff*, this court examines that Fifth Circuit case. In *Grandstaff*, officers had been chasing a suspect who was driving a pickup truck, exchanging gun fire with that suspect. *Id.* at 165. The suspect drove his pickup truck onto a ranch and hid. The owner of the ranch, noticing activity on his property, got into his pickup truck and drove out to where the activity was occurring. The officers mistook the owner for the suspect and opened fire on him, killing him. *Id.* On appeal from a successful § 1983 trial against the city, the Fifth Circuit affirmed, holding that a policy could be inferred, for purposes of municipal liability under § 1983, from the city's failure to reprimand or discharge any officer in connection with the ranch owner's death and

---

[5] The court realizes that Hodson's accounts of the shooting in his recent declaration and in his deposition differ from the statement Hodson provided during the I.A. investigation. In his recent declaration and deposition, Hodson says that, thinking that Kanae had shot McGuire, Hodson then shot Kanae. Hodson

Decl. ¶¶ 14–15; Hodson Depo. at 42–43. Because Hodson's recent declaration and deposition statements were not before the review board, however, the court does not take them into account in evaluating whether the review board ignored "holes" and "inconsistencies" in the evidence before it.

from the lack of an admission of error. *Id.* at 171. The Fifth Circuit reasoned that, "[i]f that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger." The present case, however, does not involve equivalent "dangerous recklessness." Hodson did not fire his gun without knowing that he was aiming at Kanae, who appeared to be involved in a kidnapping and who was believed to be carrying firearms.

The Ninth Circuit appears to require something more than a failure to reprimand to establish a municipal policy or ratification. In *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir.1991), the Ninth Circuit relied on expert testimony that the Los Angeles Police Force ("LAPD") routinely exonerated officers, suggesting that LAPD investigations of officers were shams. Jessie Larez had lodged a complaint with the police department, claiming that he had suffered a broken nose, and that his knees and neck needed surgery because of the manner in which police forced him to the floor. *Id.* at 634–45. Larez was notified by the police chief that none of the allegations in his complaint could be sustained. *Id.* at 635.

After Larez prevailed in a bifurcated trial against the individual officers, Larez tried his claims against the police chief and the city. *Id.* Larez's expert testified that, pursuant to the LAPD citizen complaint procedure, it was "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen." *Id.* Under that policy, the very unit being investigated "was given the responsibility of passing upon the complaint's many allegations." *Id.* at 647. The expert also concluded that the investigation in issue contained holes and inconsistencies that should have been visible to any reasonable administrator. For example, the investigation relied on testimony by an officer who had not been present "during some of the relevant incidents." *Id.* Under these circumstances, the Ninth Circuit concluded that a "jury properly could find [a] policy or custom from the failure of [the police chief] to take any remedial steps after the violations."[6] *Id.* (citing *Grandstaff*, 767 F.2d at 171).

Similar circumstances are not present here. There is no evidence that officers always escape discipline by the County or that Hodson's own unit investigated him. While Kanae and Hodson offered differing accounts of what happened, there is no evidence establishing that the County should have credited Kanae's version over Hodson's. The only other "inconsistency" identified by Kanae's expert concerned when Hodson thought McGuire had been shot. As this was not necessarily an inconsistency, as noted above, it was not a flaw that the court can say should have been visible to any reasonable administrator.

It is the Ninth Circuit's decision this year in *Haugen* that is perhaps the clearest indication of the limits the Ninth Circuit places on inferring a policy for § 1983 purposes from a failure to discipline. In *Haugen*, Officer Brosseau shot Haugen in the back as Haugen tried to escape in a Jeep. *Haugen*, 339 F.3d at 861. Haugen contended that the city and the police department should be held liable because they failed to discipline Officer Brosseau after the shooting. The Ninth Circuit noted that a single decision by a policymaker

6. Although concluding that a jury could find a policy or custom based on the city's failure to take remedial steps, the Ninth Circuit reversed on other grounds. *See id.* at 649.

may be sufficient to approve a subordinate's decision, ratifying that decision for purposes of § 1983 liability. However, the plaintiff must show that the decision was the product of a conscious, affirmative choice to ratify the conduct in question. *Id.* at 875. Such a ratification "could be tantamount to the announcement or confirmation of a policy for purposes of *Monell*." *Id.* Because there were no facts in the record suggesting that the single failure to discipline Officer Brosseau rose to the level of a ratification, the Ninth Circuit concluded that the city and the police department were entitled to summary judgment. *Id.* at 875. *Accord Santiago v. Fenton,* 891 F.2d 373, 382 (1st Cir.1989) ("we cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability").

■ *McRorie, Grandstaff, Larez,* and *Haugen* establish that municipal liability under § 1983 may arise from a city's failure to reprimand an employee. However, liability does not necessarily arise based only on a failure to reprimand. Something more than the failure to reprimand is needed to survive a motion for summary judgment. In *Haugen,* that something more was lacking. Accordingly, summary judgment was appropriate. In *Larez* and *Grandstaff,* on the other hand, there was something more. In *Larez,* evidence was introduced that there were "holes" and "inconsistencies" in the review board's findings that should have been apparent to any reasonable administrator. Moreover, the plaintiff's expert testified that it was nearly impossible for an officer to be disciplined as a result of a citizen complaint, and that a unit was allowed to investigate itself. In *Grandstaff,* the officers' conduct was so outrageous that a reasonable administrator should have known that he or she should do something about it.

In the present case, the review board concluded that Hodson had acted within the "use of force" regulations when he shot Kanae. Although Hodson and Kanae differed as to whether Kanae's hands could be seen when he was shot, there is no dispute that the review board was told that, as Hodson heard a shot coming from in the car, the door was flung open, Kanae "lunged" out of the car, and Kanae was then immediately shot. Although Kanae's statement to the emergency medical technician indicated that he had his hands raised, it did not describe how quickly he was getting out of the vehicle. It merely stated that he was shot while he "was coming out of the vehicle." Kanae was a suspect in the alleged abduction of the elderly couple and the taking of a car at gunpoint. Kanae was represented by an attorney. The police understandably concluded that they could not question Kanae as part of the internal investigation of Hodson's actions.

Notwithstanding the emergency medical technician's report that Kanae had said his hands were in the air, the review board could have justifiably concluded that, given the timing of the shot from the car and Kanae's lunge out of the car, Hodson had reason to think that a threat to himself, other officers, and/or the elderly couple made deadly force necessary. The review board did not have Kanae's September 2003 declaration before it. Accordingly, it had no statement indicating that Kanae was shot as he "was stepping away from the vehicle," as opposed to "lunging" out of the vehicle after "flinging" the door open. Instead, the facts before the review board were that Kanae was wanted and was suspected of carrying weapons; the police were responding to a report of gun shots being fired; an elderly couple in a car was asking for help; Hodson saw Kanae in the back seat of the car with the elderly couple in it; as Hodson and McGuire approached

the car, McGuire yelled "Gun"; a shot then went off from inside the car; Kanae immediately thereafter flung the door open; McGuire stumbled backward; Kanae "lunged" out of the vehicle; Hodson shot Kanae as he was "lunging" out of the vehicle; and Kanae may have had his hands in the air as he was "lunging" out of the vehicle.

■ This case does not present "something more" than a failure to discipline, as required by *McRorie, Grandstaff, Larez,* and *Haugen.* The facts presented to the review board would not, by themselves, indicate to any reasonable administrator that the shooting was improper. Having had discovery opportunities, Kanae should have opposed this motion with evidence of "something more" than the County's failure to discipline. The law does not say that every failure to discipline an officer who has shot someone is evidence of a "whitewash" policy or some other policy of "sham" investigations. The law does not say that, whenever an investigative group accepts an officer's version over a victim's differing version, this acceptance establishes a policy for which a municipality may be held liable under § 1983. If that were the law, counties might as well never conduct internal investigations and might as well always admit liability. But that is not the law. The law clearly requires "something more." As Kanae presents nothing more than the failure to discipline Hodson, the County is entitled to summary judgment on Kanae's § 1983 ratification claim.

## V. *CONCLUSION.*

For the foregoing reasons, the court denies Hodson's motion for summary judgment, but grants the County's motion for summary judgment. The only claims left for further adjudication are Kanae's claims against Hodson.

IT IS SO ORDERED.