Cynthia Marie LONG, individually, and as Personal Representative of the Estate of Dustan Dominic Long, Plaintiff,

v.

CITY AND COUNTY OF HONOLULU, Officer Patrick A. Sterling, Defendants.

No. CIV. 02–00271SPK/KSC.

United States District Court, D. Hawai'i.

July 11, 2005.

**1242**

Jack F. Schweigert, Honolulu, HI, for Plaintiff.

James C. Butt, Marie Manuele Gavigan, Wyeth M. Matsubara, Office of Corporation Counsel, James Kawashima, Toby M. Tonaki, Watanabe Ing Kawashima & Komeiji, Honolulu, HI, for Defendants.

## ORDER GRANTING DEFENDANTS' REVISED MOTION FOR SUMMARY JUDGMENT

SAMUEL P. KING, District Judge.

### INTRODUCTION

Defendants Officer Patrick A. Sterling and the City and County of Honolulu renew their motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, primarily asserting there are no material questions of fact as to (1) qualified immunity for Officer Sterling, and (2) "deliberate indifference" on the "*Monell* claim" for municipal liability against the City. Common law claims are also addressed, although disposition of the state law claims follows from the rulings on the federal claims.

On January 3, 2003, the Court denied without prejudice a similar motion brought by Defendants. Discovery was not complete then and Plaintiff requested time for additional discovery under Fed.R.Civ.P. 56(f). The Court denied the Defendants' motion without prejudice to Defendants renewing it after completion of discovery. Meanwhile, Officer Sterling served a year in Iraq as a reservist soldier recalled to active duty and the case was stayed pursuant to 50 U.S.C. App § 521 from April 2003 until early–2004.[1] Discovery is now complete and Defendants have renewed their motion for summary judgment. The

---

1. The Court was informed by the parties at oral argument that Officer Sterling is currently serving another term in Iraq. The July 2005 trial date was vacated pending disposition of this motion.

motion was argued on June 23, 2005, with James Kawashima appearing for Defendants and Jack Schweigert appearing for Plaintiff.

## DISCUSSION

Given the prior proceedings, the Court begins where it left off when the previous motion was denied. The Court will not repeat all the background here. Important facts are repeated where appropriate, but otherwise the January 3, 2003, order is incorporated by reference and the Court presumes familiarity with the issues as analyzed previously.

### *1. Qualified Immunity*

In applying the test for allowable use of deadly force as set forth in *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) and *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the primary issue of fact identified during the prior proceedings was whether Officer Sterling had probable cause to believe that Dustan Long posed a "threat of serious physical harm, either to [himself] or others," to justify the use of deadly force when considering objectively the situation be confronted when he shot Long in June of 2001.[2] Much was made of whether Long actually fired a shot at other officers immediately before Officer Sterling shot Long. The January 2003 order indicated that:

> . . . Long might indeed have presented a real and immediate threat to the safety of officers when Sterling shot him. Long had shot others earlier and he was armed. Nevertheless, the record is not clear as to exactly what occurred, especially as to whether Long had actually fired at the police. If Long had not fired at officers, perhaps, depending upon the circumstances, he did not pose an "immediate" threat. Although qualified immunity should be decided early in a proceeding, the record is sufficiently vague at present so as to allow Plaintiff[ ] the opportunity for further discovery.

[January 2, 2003, Order at 8].

Reviewing the record construed in favor of Plaintiff as is required at a summary judgment stage of the proceedings, there is still a question of fact as to whether Long actually fired a shot at officers immediately before Sterling shot him. Much of the evidence indicates that Long did in fact fire at Officers Marini or Canella. But no corresponding bullet or casing from Long's .22 rifle was found.[3] Several witnesses say they didn't hear a shot fired at around 04:52 hours (other than the fatal shot by Sterling around 04:52 hours) or can't recall hearing a shot preceding Sterling's shot. On the other hand, several witnesses (Officers Sterling, Dalbec, Kaholokula, Vargas, Fuata, Marini and others) testified that Long fired just before Sterling fired, and that they heard the shot. This testimony is supported by the "CAD" printout of contemporaneous radio trans-

---

**2.** *See, e.g., Brosseau v. Haugen*, —— U.S. ——, ——, 125 S.Ct. 596, 598, 160 L.Ed.2d 583 (2004) (reiterating that use of deadly force is not constitutionally unreasonable "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others") (quoting *Garner*, 471 U.S. at 11, 105 S.Ct. 1694).

**3.** At least three casings were found. [Shinsato Depo. at 26; Murakami Depo. at 16 (indi-cating five casings)]. Two were by the front gate, possibly from the shots fired earlier in the morning at the car. [Murakami Depo. at 16]. Another shell was found in the front of the residence, near the kitchen, consistent with a shot being fired 45 minutes earlier at about 0407 hours. [Id.]. Others might have been from shots fired to break up the party earlier. In any event, nothing was found near where it should have been if Long had shot at Marini or Canella, who were on the perimeter of the premises, probably in a ditch.

missions, as verified by dispatcher Battease, which indicates shots fired at 04:51:33 ("shots fired.. he just shoot at us").

The dispute of fact, however, does not resolve matters for this motion. Rather, the question here for purposes of qualified immunity is whether that dispute is "material." That is, even assuming Long did *not* shoot, the Court is still obligated to consider whether, from the other undisputed facts, Sterling is nonetheless entitled to qualified immunity. As set forth in the previous order, under the Supreme Court's test for qualified immunity articulated in *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), courts must first consider whether "[t]aken in the light most favorable to the party asserting the injury, do the facts ... show the officer's conduct violated a constitutional right?" If the answer is no, there is qualified immunity. If the answer is yes, the court then asks whether the right was "clearly established." *Id.* at 201–02, 121 S.Ct. 2151.

Again, "[a] police officer may reasonably use deadly force where he 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Billington v. Smith,* 292 F.3d 1177, 1184 (9th Cir.2002) (quoting *Garner,* 471 U.S. at 11, 105 S.Ct. 1694). The Court should consider "the totality of the facts and circumstances in the particular case including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Blanford v. Sacramento County,* 406 F.3d 1110, 1115 (9th Cir.2005) (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

The reasonableness inquiry is objective, without regard to the officer's good or bad motivations or intentions. *Id.* The court judges reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

Even if Long did not fire immediately before Sterling fired, the following facts are uncontested or cannot reasonably be disputed:

1) Long had already shot twice at people (or at their car as it drove away). Although Plaintiff argues that Long did not actually know whether he *hit* anyone (he did of course hit two people who. went to the hospital and called 911), it cannot reasonably be disputed that Long knew he had fired at them.

2) Long was barricaded in his residence, surrounded by police. He was certainly armed (he was seen several times walking outside with a rifle and one was found next to or under him after. he was shot). He did not surrender, although there might be some question whether he wanted to or attempted to surrender. Despite Plaintiff's argument to the contrary, it cannot reasonably be disputed that Long was in fact armed. Even assuming Kurt Umeno "hid" the rifle earlier—after Long had fired at around 02:00 hours—Long must have then "found" it because there is undisputed testimony from multiple witnesses that Long was seen carrying a rifle from before 04:07 (when he fired at something in the "front" or kitchen area of the house) and when he was shot at 04:52 hours.

3) Long was agitated. He told police to turn off the spotlight or lights shining on the house, or he would shoot. [Marini Affidavit at 3 ("Long went on to say he had firearms and would use them"); Yamada Affidavit at. 2–3; Edayan Decl. at 2

("Dusten said he was going to shoot some cops"); Sterling Affidavit at 2–3]. Even Umeno says that Long told him "police were coming in the front window and he could see them in other places on his property." [Umeno Decl. at ¶ 16]. Umeno heard Long yell at police that they had 10 seconds "to get the 'F' out of his yard." [Id.]. He heard Long "do a count-down, shouting to the officers to get off his property." [Id.]. Umeno's declaration is consistent with testimony of Marini that Long yelled at them "I told you f* * *ers to get the f* *k back ... Have some of this." [Marini affidavit, ¶ 23; CAD timeline about 04:47:41 ("He was clg [calling] threats .. we had to jump in the ditch")]. Umeno's declaration is also consistent with other testimony that Long threatened to shoot police ("bring it on, let's see it") if the spot lights were not turned off. [Sterling Affidavit at ¶¶ 14–16].

4) Officers Marini and Cannella were on the perimeter in a ditch. (There is some discrepancy as to when exactly they jumped into the ditch.) Sterling and Dalbec were positioned across the street as "counter snipers" viewing Long through scopes. Sterling was hearing the radio transmissions between police. [Sterling Affidavit at 2–3]. Before Officer Sterling fired at Long, Officer Marini radioed "he's shooting at us." [E.g., Marini Affidavit at 4; Yamada Affidavit at 3; Ben–Rajab Depo. at 52]. This is also confirmed by the CAD stenographic record of radio transmissions at 04:51:33 hours. Sterling heard this. [Sterling Affidavit at 4]. Sterling then shot at Long. (Sterling says it was immediately after or nearly simultaneously with the transmission.) The CAD stenographic record indicates at 04:52:18

"sniper shot taken." Although dispatcher Battease indicates there might have been some delay with the inputting of the text, there is no dispute that Long was shot right about 04:52 hours.

■ Given these undisputed facts, the Court finds as a matter of law that Officer Sterling is entitled to qualified immunity. Considering all of the circumstances and viewing the disputed facts in favor of Plaintiff, the Court readily concludes that Officer Sterling had probable cause to believe that Long was an "immediate" threat of serious physical harm to other officers located on the perimeter next to Long. *See, e.g., Blanford,* 406 F.3d at 1116 (finding qualified immunity where deadly force was used to stop suspect appearing to threaten others with a sword); *Billington,* 292 F.3d at 1184–85 (finding qualified immunity where deadly force was used despite question of fact whether, at the moment of the shooting, the suspect and officer were grappling over a gun, because the factual dispute was immaterial). Long had fired before, he said he was going to fire, Marini transmitted that Long was shooting at them, and Sterling saw and heard this. It was objectively reasonable under these undisputed facts for Sterling to believe that a shot was needed.

This belief would be so even if, construing disputes in favor of Plaintiff, Long did not actually fire immediately before he was shot. From Sterling's perspective (and, again, without the benefit of 20/20 hindsight as cautioned in *Graham,* 490 U.S. at 393, 109 S.Ct. 1865), the amount of force was reasonable. Indeed, Sterling was entitled to have made a mistake—even a tragic mistake—in his perception.[4] *See,*

---

4. This is not to suggest that the shooting was not necessary. We cannot know that. Even assuming Long had not fired immediately before Sterling fired—given what was indisputably occurring—Long might have shot immediately thereafter. But, again, under *Garner* the test here is whether Sterling had "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."

*e.g., Saucier,* 533 U.S. at 206, 121 S.Ct. 2151 ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution"); *Blanford,* 406 F.3d at 1116 (affirming grant of qualified immunity where mistaken use of deadly force was nevertheless objectively reasonable); *Billington,* 292 F.3d at 1184 ("an officer might be reasonably mistaken as to the facts justifying his actions ... so that an officer could use objectively excessive force without clearly violating the constitution").

The Court has given much thought to Plaintiff's argument that we must be especially careful in deadly force cases where the best witness (i.e., the victim) to contradict the officer is actually killed rather than merely injured. *See Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994) ("Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness.... The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts"). But, unlike the situation described in *Scott,* here there is much evidence and many *other* witnesses to determine whether an officer's conduct was objectively reasonable. *See Billington,* 292 F.3d at 1181–82 (distinguishing *Scott* because there were several other witnesses). In any event, the Court has carefully considered all the evidence in the record as *Scott* instructs and concludes that there was no constitutional violation.

### 2. Municipal Liability

■ The Court also grants Defendants' motion as to claims against the City and County of Honolulu. If there is no constitutional violation, there can be no municipal liability. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.") (emphasis in original); *Fairley v. Luman,* 281 F.3d 913, 916 (9th Cir.2002) ("Exoneration of [the officer] of the charge of excessive force precludes municipal liability for the alleged unconstitutional use of such force").

In any event, to find municipal liability under *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), for civil rights violations under 42 U.S.C. § 1983, Plaintiff must prove "that the defendants have customs or policies which amount to deliberate indifference to their constitutional rights and that these policies are the moving force behind the constitutional violations." *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (quoting *City of Canton v. Harris,* 489 U.S. 378, 389–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) (internal quotation and editorial marks omitted).

That is, under *City of Canton,* plaintiffs must prove that the official policy was "deliberately indifferent" to their constitutional rights. "This occurs when the need for more or different action 'is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390, 109 S.Ct. 1197.

■ Plaintiff bases municipal liability primarily on a failure to train or discipline theory. The Court assumes as true for purposes of this motion that Officer Sterling had two prior excessive force complaints lodged against him in the late–1990's that resulted in a letter or letters of reprimand. Those complaints were based upon alleged striking persons who were being arrested.

Those prior complaints or incidents do not establish "deliberate indifference" regarding a failure to train or discipline. The situations did not involve improper use of firearms. They did not involve the use of deadly force. They resulted in a form of discipline in a letter of reprimand (i.e., the police department did not condone the excessive use of force). They do not indicate "deliberate indifference" on the part of the Honolulu Police Department *See. e.g., City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (indicating that municipal liability based upon alleged inadequate training could not be derived from a single incident of misconduct by a non-policy-making employee). To hold the City liable for retaining Sterling under this record would mean that the City would have to fire every officer who ever used any amount of unnecessary force.

■ As for a failure to train, the undisputed evidence is that the police department has an extensive training program that includes instruction in use of deadly force. [*See. e.g.,* Affidavit of Tamashiro]. Plaintiff points out that the Honolulu Police Department's written policy explaining "deadly force" *changed* (or at least the wording changed) from 2000 to 2002. Prior to the shooting of Long, the policy explained that "deadly force shall be used only when an officer reasonably believes that it is necessary." [Doc. A00047, attached to Deposition of Donohue]. Sometime after the shooting, the policy was changed to read "deadly force may be used only when an officer reasonably believes that the use of force is necessary to defend his or her own life or that of another person in immediate danger of death or serious bodily injury." [Exhibit to Donohue deposition].

The prior policy statement is not incorrect.[5] Perhaps it could have been more detailed to mirror the factors in *Graham*, as does the 2002 statement.[6] But even so,

---

5. In its entirety it provided:
   Deadly force is force used with the intent of causing, or which the actor knows will create a substantial risk of causing, death or serious bodily injury. It does not include force that is not likely to cause death or serious injury, but which unexpectedly results in such. Deadly force shall be used only when an officer reasonably believes that it is necessary.
   The U.S. Supreme Court has ruled that the use of deadly force is a seizure subject to the "reasonableness" requirement of the Fourth Amendment. Even where an officer has probable cause to arrest a subject, it may be unreasonable to do so using deadly force.
   [Donohue Depo. Exh. A–00047].

6. The December 18, 2002, statement provides:

   Deadly force is force used with the intent of causing, or which the actor knows will create a substantial risk of causing, death or serious bodily injury. It does not include force that is not likely to cause death or serious injury, but which unexpectedly results in such. Deadly force may be used only when an officer reasonably believes that the use of such force is necessary to defend his or her own life or that of another person in immediate danger of death or serious bodily injury.
   The U.S. Supreme Court has ruled that the use of deadly force is a seizure subject to the "reasonableness" requirement of the Fourth Amendment. Even where an officer has probable cause to arrest a subject, it may be unreasonable to do so using deadly force.
   [Donohue Depo. Exh. following A–00047].

it does not mean that the City failed to train in the use of deadly force such that the policy was "deliberately indifferent" to the rights of citizens. The evidence indicates that officers knew the proper standard. [*E.g., compare* Dalbec depo. at 19] ("If a person is a threat to someone else or myself to cause them serious [bodily] injury or death") *with* the legal standard from *Garner* ("[a] police officer may reasonably use deadly force where he has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others"). Moreover, Plaintiff has failed to establish a question of fact as to the necessary causal-connection between any assumed deficiency and Plaintiff's constitutional injury (if there were one). *See City of Canton*, 489 U.S. at 390–91, 109 S.Ct. 1197 (requiring proof that the identified deficiency in training was the actual cause of the injury and commenting that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable").

■ Next, there is insufficient evidence that, after the shooting, the City should be held liable for failing to aid Long, improperly delaying medical attention, or somehow allowing him to "bleed to death." The objective (and subjective) evidence indicates clearly that police did not know the particulars of the threat after Long was shot. From the police's perspective, Long could have been only injured and still armed and capable of "shooting some cops" as he said he would. As far as police knew, there could have been others who were armed (and there was at least one

other person at the residence). [E.g., Deposition of Burns, at 44–46]. It was prudent for police to wait for the national guard vehicle to enter the premises. There can be no due process-type violation here.[7]

■ Finally, Plaintiff asserts that the City "ratified" Officer Sterling's actions by failing to discipline him (or otherwise having a defective internal affairs investigation policy) in this particular case. This theory fails for lack of causation. Even if the after-the-fact internal investigation here was somehow a "coverup" (and there is no such evidence), it would not have prevented the shooting of Long. *See Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir.2003) ("[Plaintiff] cannot, of course, argue that the municipality's later action (or inaction) caused the earlier shooting"), *re'vd on other grounds*, —— U.S. ——, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). In *Haugen*, the Ninth Circuit also rejected the type of "ratification" theory espoused by Plaintiff's here. *Id.* ("the plaintiff must show that the triggering decision was the product of a 'conscious affirmative choice' to ratify the conduct in question.... there are no facts ... that suggest that the single failure to discipline .... rises to the level of such a ratification.") (citation omitted).

Even assuming, as Plaintiff emphasizes, that the internal investigation did not focus on a missing casing or on prior complaints of excessive force against Sterling, this is not evidence that the City itself ratified the shooting of Long. *See, e.g., Kanae v. Hodson*, 294 F.Supp.2d 1179, 1190 (D.Haw. 2003) ("liability does not necessarily arise

---

**7.** As Plaintiff acknowledged at oral argument, there can be no Eighth Amendment claim here for the alleged failure to aid. Eighth Amendment claims would be restricted to prisoners after conviction. *See generally Gibson v. County of Washoe*, 290 F.3d 1175, 1187

(9th Cir.2002) ("Because [plaintiff] had not been convicted of a crime ... his rights derive from the due process clause rather than the Eighth Amendment's protection against cruel and unusual punishment") (citations omitted).

based only on a failure to reprimand. Something more than the failure to reprimand is needed to survive a motion for summary judgment"). As the Court reasoned in *Kanae:*

> [t]he law does not say that every failure to discipline an officer who has shot someone is evidence of a 'whitewash' policy or some other policy of 'sham' investigations. The law does not say that, whenever an investigative group accepts an officer's version over a victim's differing version, this acceptance establishes a policy for which a municipality may be held liable under § 1983.

*Id.* at 1191. The Court finds no basis for a ratification theory of municipal liability here.

### 3. Common Law Claims

 Plaintiff also alleged state law claims for infliction of emotional distress and punitive damages that are essentially dependent upon the federal claims. If the federal claims fail then Plaintiff cannot prove intentional infliction of emotional distress or malice for purposes of punitive damages. There is no evidence of negligence for purposes of a negligent infliction of emotional distress claim. Moreover, municipalities are immune from punitive damages in the circumstances of this case. *Lauer v. YMCA*, 57 Haw. 390, 557 P.2d 1334, 1342 (1976) ("Public policy dictates the conclusion that the City, as a municipal corporation, should not be held liable for punitive damages"); *City of Newport v. Fact Concerts*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (A local government unit is immune from punitive damages under § 1983). The state law claims are dismissed.

### CONCLUSION

(1) Officer Patrick Sterling is entitled to qualified immunity.

(2) Because there was no constitutional violation, the City likewise cannot be liable under 42 U.S.C. § 1983. Even if there were a violation, there is no "deliberate indifference" for purposes of municipal liability.

(3) For similar reasons, the state law claims fail as well.

Accordingly, the Court GRANTS Defendants' Revised Motion for Summary Judgment, filed on May 11, 2005.

IT IS SO ORDERED.